# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

KIPU SYSTEMS LLC,
a Florida limited liability company,

        Plaintiff/Counter-Defendant,

v.

ZENCHARTS LLC, a Florida limited liability company,
SOLUTIONS RECOVERY CENTER, LLC,
a Florida limited liability company,

        Defendants/Counter-Plaintiffs, and

ZEN MEDICAL, LLC, an administratively dissolved
Florida limited liability company,
WEBSITE CONSULTANTS INC., a Florida corporation,
RICHARD 'RICK' GLASER, an individual,
KEITH HOUILHAN a/k/a KEITH HOOTIE, an individual,
SEAN CALLAHAN, an individual,
DANIEL J. CALLAHAN, an individual,
YANKO KARKALICHEV, an individual, and
ANTON ALADZHOV, an individual,

        Defendants.        /

Case No.1:17-cv-24733-KMW-EGT

**JURY TRIAL REQUESTED**

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants ZenCharts, LLC ("ZenCharts"), Solutions Recovery Center, LLC, ("Solutions"), Website Consultants Inc. ("Website Consultants"), Richard 'Rick' Glaser ("Glaser"), Sean Callahan, Daniel Callahan ("Dan Callahan"), and Yanko Karkalichev ("Karkalichev") (together, "Defendants") move for entry of partial summary judgment on each claim of the Amended Complaint [DE 118] filed by Plaintiff Kipu Systems, LLC ("Kipu"), except for Count II and Count IX. In support, Defendants state as follows:

## INTRODUCTION

Solutions operated a substance use disorder treatment center in South Florida owned in part by Dan Callahan, his son Sean Callahan, and Glaser. Beginning in the fall of 2013, Solutions recognized the need to modernize its medical records, review and oversight process with the purchase and implementation of an electronic medical records ("EMR") system. At that time in 2013, there were very few EMR providers in the behavioral health field, and even fewer that specifically devoted their attention to the alcohol and drug treatment segment of behavioral health. Ultimately, on October 8, 2013 contracted Solutions with Kipu, at the time the leading provider in EMR systems for the alcohol and drug treatment industry, to purchase and implement its EMR system. However, the Kipu product was unusable and its implementation at Solutions was a disaster. As a result of Kipu's breach,[1] Solutions paused the implementation, refused to make further payments, and was forced to consider other EMR systems.

During and following the debacle of the Kipu EMR implementation, Dan Callahan, Glaser, and Sean Callahan realized that the Kipu product was fundamentally inferior and would never adequately meet Solutions' EMR. Looking around, there were no other EMR options in the marketplace tailored specifically for the alcohol and drug treatment industry, and those that attempted to do so, including Kipu, fundamentally misunderstood treatment centers' needs. Dan Callahan, Sean Callahan and Glaser also recognized that they had the combined experience in both the treatment industry and in technology to build a better EMR system themselves. And thus, the idea of ZenCharts Electronic Health Record ("EHR") system was born.

In late 2013 and early 2014, Dan Callahan, Glaser, Sean Callahan and others, including Karkalichev, began the process of building a new product which, in time, would revolutionize the industry. Dan Callahan, Glaser, Sean Callahan, and Karkalichev never had access to any of the coding or trade secrets (if any) in the Kipu system, did not appropriate any trade secret or confidential information of Kipu, and did not violate any prohibition in the Kipu Contract in the development of a competing system. Instead, Dan Callahan, Glaser, and Sean Callahan wanted to create something far better than, and different from, the Kipu system. In the following months, Dan Callahan, Glaser, and Sean Callahan did create an EHR product with cutting edge innovations and that product was ZenCharts.

---

[1]      Solutions has filed a counterclaim for Kipu's breach of contract.

Today, ZenCharts, LLC has more than one hundred satisfied customers with almost two hundred locations, servicing more than 6,000 users, and more are joining the ranks every day. Some of the customers ZenCharts has acquired were, and are, disgruntled and unhappy former Kipu customers. Because Kipu has been losing market share and customers to the superior ZenCharts product, Kipu has sought, through unfair and deceptive trade practices, to achieve what it could not achieve in the marketplace with its inferior product. Kipu has engaged in a campaign of deceptive, misleading, and outright false claims directed to current or potential ZenCharts' customers in the hope of damaging ZenCharts reputation in the marketplace, steering potential customers away from ZenCharts, interfering with ZenCharts' contracts with its current clients, and stealing those customers based on false information.[2]

On December 31, 2017, Kipu filed this action seeking to do through litigation what it could not (fairly) do in the marketplace – to put ZenCharts out of business. Kipu's "everything but the kitchen sink" Complaint and Amended Complaint contained a host spurious (and outright false) claims, which had no legitimate factual or legal basis. For example, Kipu has claimed that Defendants accessed, copied and stole Kipu's source code when Kipu knew that it was impossible for Defendants to access Kipu's source code from its user interface.  There was (and is) no proof that the two products have ever shared a single line of code.  In fact, the two products are written in two completely computer languages. Kipu further claimed that its user interface constituted a trade secret, even though its customers and potential customers had access to that user interface, and the entire world was shown descriptions of Kipu's features, functionalities, and screenshots of the user interface. Kipu even claimed infringement of a trademark before that trademark was ever registered. Defendants answered those baseless claims, and Solutions and ZenCharts filed counterclaims of their own. The discovery deadline passed on April 21, 2019. *See* DE 109, p. 2.

On May 3, 2019, after well over a year of extensive written discovery, depositions, and motion practice, Kipu filed its Motion for Leave to Amend Complaint Solely for the Limited Purpose of Withdrawing Certain Claims (the "Motion to Amend"; DE 156). After almost seventeen months of litigation, Kipu now seeks to withdraw nine of its fourteen claims (including all of the federal claims, upon which this Court's jurisdiction is based) without

---

[2]     All of those claims are contained in ZenCharts' counterclaim in this action.

prejudice. Defendants have objected to that motion. *See* DE 167. If Kipu is allowed to withdraw its claims without prejudice, this Court will lose jurisdiction over the remainder of this case, the Defendants would likely have to start over from square one in Florida state court, Defendants will incur unnecessary expense, and the scarce judicial resources this Court has already devoted to this matter would be wasted. If this Court were to dispose of all of Kipu's federal claims by summary judgment, however, this Court would have the "discretion to continue to exercise supplemental jurisdiction over [the plaintiff's] state law claims." *See Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). Consequently, Defendants cannot agree to the voluntary withdrawal of those federal claims, and have instead filed this partial motion for summary judgment, requesting that the Court enter judgment on all but one of Kipu's federal claims on the merits. If and when this Court grants partial summary judgment, jurisdiction over whatever claims remain will be preserved.

Kipu only seeks to maintain its Florida Computer Abuse and Data Recovery Act ("CADRA") count (Count I), three breach of contract counts (Counts II, III, and XIV), and its Florida common law unfair competition count (Count XI). Defendants seek partial summary judgment on all but one of those claims, Count II.

As it implicitly acknowledged in its Motion to Amend, Kipu will not be able to prove any of the remaining claims in this case. Defendants seek partial summary judgment on the remaining counts, with the exception of the trademark infringement claim in Count IX. The claims that Kipu seeks to withdraw are addressed in the second section of this motion, and are italicized to indicate that Kipu has sought to withdraw those claims on its own.

Finally, Kipu has no reliable evidence to support its damages claims, and those claims are contrary to applicable law and are barred by Kipu's purported terms of service. Defendants seek partial summary judgment to exclude Kipu's claims for damages.

As set forth in greater detail below, Kipu's Amended Complaint purported to set forth the following claims, which fail for the following reasons:

## CLAIMS THAT KIPU SEEKS TO MAINTAIN

**Count I.**       **Florida's Computer Abuse and Data Recovery Act (Fla. Stat. § 668.801)**

Kipu's CADRA claim fails because Kipu cannot show any "unauthorized access" under the statute. Every witness who has testified in this case acknowledges that Defendants were authorized to access Kipu's system and were given a username and password for that purpose.

Instead, Kipu's CADRA claim is based on its claim that Defendants allegedly exceeded the "authorized scope of access."  But even if true, that simply is not a violation of the statute, and Kipu's interpretation of the statute has been specifically rejected by federal courts interpreting Florida law.

**Count XIV.    Breach of Contract (Kipu October 2013 Terms of Service)**

Kipu alleges that Defendants breached the 2013 Terms of Service, a document that was only available on Kipu's website. However, Kipu cannot show that there was ever any mutual assent to those Terms of Service, and the terms were never incorporated into the written contract between Kipu and Solutions. Moreover, those defects were not cured by Defendants' access to the Kipu system because there was no valid "click-wrap" or "browse-wrap" agreement.

**Count III.      Breach of Contract (Kipu January 2014 Terms of Service)**

Like the 2013 Terms of Service, Kipu never provided Defendants with the 2014 Terms of Service.  Kipu did not attach them to the contract, and the parties never discussed any Terms of Service. In January 2014, after Solutions had paused implementation of the Kipu system and refused to make further payments to Kipu for the implementation, Kipu, unilaterally and without notice, changed the Terms of Service to include a host of new restrictive provisions. However, under black-letter Florida law, a "party can only reserve its right to unilaterally change a contract where that reservation is subject to limitations, such as reasonable notice." *Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014). And in any event, all of the access by Defendants was on behalf of disclosed principals (customers of Kipu), and Kipu's claims, if any, must be against those principals.

**Count XI.      Florida Common Law Unfair Competition**

A Florida common law unfair competition claim has the same elements as a violation of the Lanham Act's unfair competition provisions. As Kipu (admittedly) cannot maintain a Lanham act claim for unfair competition, its common law unfair competition claim necessarily fails as a matter of law as well.

<u>**CLAIMS  THAT KIPU SEEKS TO VOLUNTARILY DISMISS**</u>

*Count X.          Federal Unfair Competition – Passing Off (15 U.S.C. § 1125(a))*

Kipu's "unfair competition" and "passing off" claim fails as a matter of law. Kipu does not actually allege that ZenCharts attempted to pass off its system as being made by Kipu—Kipu acknowledges that ZenCharts was a competitor. Likewise, Kipu has presented no evidence of

customer confusion as to the maker of ZenCharts, or of potential confusion.

**Count VIII.     Trademark Counterfeiting (15 U.S.C. §§ 1114(1) and 1116(d)(1)(B))**

Kipu alleges that its EMR system had a box to check for when a patient was admitted "one time only" or "OTO," and that this trademark was registered on January 24, 2017. ZenCharts used the term "OTO" in its EHR system at a client's request for less than a year, and ceased use of the term well before Kipu registered it with the USPTO. Moreover, Kipu has presented no evidence that any passing use was intentional (as required), or that it caused any damages (as required).

**Count IV.       Misappropriation of Trade Secrets (18 U.S.C. § 1836(b))**

As a preliminary matter, Kipu fails to describe with reasonable particularity any actual "trade secrets" that were allegedly taken. Further, Kipu's trade secret claims are barred by the Eleventh Circuit's decision in *Warehouse Solutions, Inc. v. Integrated Logistics, LLC*, 610 F. App'x 881 (11th Cir. 2015), where the Court of Appeals held, on remarkably similar facts, that the "look and feel" and "features and functions" of the user interface were not trade secrets and, even if they were, they were not adequately protected.

**Count V.        Civil Conspiracy to Commit Trade Secret Theft**

Kipu does not allege any specific conspiracy. Nor does Kipu allege any specific trade secret claim. Instead, Kipu only alleges that a few individuals that worked together at a single entity "conspired"—which is not actionable under the intracorporate conspiracy doctrine.

**Count VI.       Conversion of Confidential and Proprietary Information**

Again, Kipu fails to allege or prove any specific confidential information that was converted, instead alleging broad categories of "trade secrets." Regardless, the conversion claim is preempted by Florida Statute § 688.008, which explicitly preempts common law as to trade secret claims.

**Count VII.      Common Law Trespass to Chattels**

Kipu claims that Defendants trespassed upon its EMR system. But "Florida law does not recognize an action for trespass to chattels in cases where the plaintiff has alleged unauthorized access to a database or website." *Bain v. Jocket Club Tech. Servs., Inc.*, No. 07-80371-CIV-HURLEY/HOPKINS, 2007 WL 9706994, at *4 (S.D. Fla. Oct. 2, 2007). Therefore, Kipu's claim for trespass to its electronic medical records database fails as a matter of law.

***Count XII.        Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.204(1)***

Kipu's FDUTPA claim fails because Kipu does not allege and cannot show customer harm, as is statutorily required. FDUTPA also requires proof of actual damages, not lost profits. But the only damage Kipu seeks in this case is for lost profits.

***Count XIII.    Tortious Interference with Business Relationships***

Kipu does not allege any concrete business relationships with which Defendants purportedly interfered without justification. Kipu merely alleges potential customers in general, which cannot form the basis of a tortious interference claim. Defendants were allowed under Florida law to compete with Kipu, and did so in a legally privileged manner.

## KIPU'S CLAIMS FOR DAMAGES

Kipu's damage model, which seeks to combine Kipu's lost profits with disgorgement of ZenCharts' profits, is invalid as a matter of law. Moreover, Kipu does not have any admissible damage model as Kipu's expert should be excluded under Federal Rule of Civil Procedure 702. As set forth in the separate motion on this issue, Kipu's expert, Alan I. Blass, should be excluded because his theories are not supportable by any accepted theory of calculating lost profits, and his data is not sufficient or reliable.

## MEMORANDUM OF LAW

### Standard of Review

"Under Fed. R. Civ. P. 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987). "The moving party is entitled to 'judgment as a matter of law' when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). As set forth below, there are no genuine issues as to any material fact, and summary judgment should be entered in Defendants' favor.

### Count I: Kipu's CADRA Claim Fails

Florida's Computer Abuse and Data Recovery Act ("CADRA"), Fla. Stat. § 668.801, *et seq.*, requires Kipu to demonstrate that Defendants, knowingly and with intent to cause harm or loss, obtained information from a protected computer without authorization and, as a result,

Defendants actually caused harm or loss. *See* Fla. Stat. § 668.803. Kipu pled two different methods and time periods of access that purportedly violated CADRA—(i) between October 10, 2013 and January 19, 2014, during Solutions' failed attempt to implement the Kipu System, and (ii) between September 10, 2015 and October 2015, during the transition of two potential customers from Kipu to ZenCharts at those customers' requests. *See* Amended Complaint at ¶¶ 34, 40-42, 59, 61, 128-129. However, neither fact pattern gives rise to a CADRA claim because, in both situations, Defendants were authorized to access Kipu's EMR System—first with Kipu's permission, then with the permission of Kipu's clients.

      **a.**    **Kipu's 2013-2014 Access Claims Fail**

      **i.**    **Kipu Gave Access in 2013-2014 to Solutions and its Agents**

Kipu's claims for access between October 10, 2013 and January 19, 2014 ("2013-2014 Access") fail because it is undisputed that Kipu gave Defendants access to its EMR System. On October 8, 2013, Solutions and Kipu entered into a contract for the implementation of the Kipu EMR system at Solutions ("Kipu Contract"). Amended Complaint, Ex. A, p. 3 [DE 118-1]. Kipu subsequently cut off access to the after Solutions' account on January 19, 2014, after the disastrous implementation had failed, after Solutions had decided to pause the service, and after Solutions had refused to make further payments to Kipu for the implementation. *See* 30(b)(6) Deposition of Kipu at p. 70, ll. 7-10.

Under CADRA, a third-party agent of the owner of a computer cannot be held liable if "given express permission . . . to access the protected computer through a technological access barrier." Fla. Stat. § 668.802(1). In its Amended Complaint, Kipu specifically alleges that "[b]etween October 10, 2013 and January 16 [sic], 2014, **Kipu allowed for certain 'Super Admin' login-in rights** (via appropriate technological access barriers) to be provided to Dan Callahan, Sean Callahan, Glaser and later Karkalichev . . . ." *See* Amended Complaint at ¶ 128 [DE 118] (emphasis added). Kipu gave Solutions and its agents access to its system until January 19, 2014, when Kipu ceased allowing access. *See* 30(b)(6) Deposition of Kipu at p. 70, ll. 7-10. Kipu does not allege that Defendants accessed its system at any other point in 2014 after access was revoked. *See* Amended Complaint at ¶ 45. Kipu specifically alleges that it allowed for Defendants' access. Therefore, Kipu's CADRA claim for the 2013-2014 Access fails as a matter of law.

Further, Solutions had the authority to allow its agents to access Kipu's EMR system. Kipu authorizes the customer, in this case Solutions, to make the determination of who gets access to the customer's account in the Kipu system. *See* 30(b)(6) Deposition of Kipu, at p. 42, ll. 8-12. Kipu grants the customer access to the customer's account, and the customer is then authorized by Kipu to add additional users as it sees fit. *Id*. at p. 41, ll. 4-11. Kipu requires no written or other authorization by Kipu when the customer adds an authorized user. *Id*. at p. 44, ll. 21-25, p. 45, ll. 1-16. The Kipu Contract with Solutions did not restrict who Solutions could authorize as a user on the account. *See* 30(b)(6) Deposition of Kipu, at p. 46, ll. 17-24; p. 47, ll. 21-24. The Kipu Contract did not define "user" or "authorized user." *Id*. Under the Kipu Contract, Solutions could add as many users as it wanted. *Id*. at p. 47, ll. 15-19. Even under the 2013 Terms of Service, which Kipu claims apply (and which Solutions disputes apply), there is no restriction on who the customers can authorize as users. *See* 30(b)(6) Deposition of Kipu, at p. 51, ll. 9-23; Depo. Exhibit 13. Under the Kipu Contract and the 2013 Terms of Service, then, Kipu expressly allows the customer to determine who has authority to access its account. *See* 30(b)(6) Deposition of Kipu, at p. 52, ll. 20 – p. 53, ll. 5.

All of the Defendants who accessed the system before January 19, 2014 were agents of Solutions. *See* Deposition of Glaser at p. 139, l. 13 – p. 146, l. 7. Defendants were authorized by Solutions to access the Kipu system on Solutions' behalf, and were provided usernames and passwords by Kipu and then Solutions for that purpose. *See* Deposition of Glaser at p. 139, l. 13-146, l. 7. Thus, by any measure, Kipu authorized Solutions' and its agents' access to the Solutions' account in the Kipu system in this time period.

Kipu's novel CADRA theory for the 2013-2014 Access depends on the allegation that Defendants were logging onto the system with the usernames and passwords that were provided, but "under the false pretense that they were involved in the implementation of Solutions' license of the Kipu EMR System," and for a purpose beyond the scope of authorized use – i.e., to copy and steal the Kipu system. *See* Amended Complaint at ¶¶ 129, 132 [DE 118]. In other words, Kipu admits authorized access, but argues that access was acquired under "false pretenses" and for an unauthorized purpose. *See id.* These allegations, however, do not establish a valid CADRA claim. In *Grow Fin. Fed. Credit Union v. GTE Fed. Credit Union*, No. 8:17-CV-1239-T-30JSS, 2017 WL 3492707, at *2 (M.D. Fla. Aug. 15, 2017), an employer sued a former employee for stealing its trade secrets and confidential information and sending the information

to a competitor. The former employee moved to dismiss the complaint because she was authorized to access the system. *Id.* Relying on the definition of "authorized user," the court found that the employer's allegations of theft, even if taken as true, did not amount to allegations "that [the employee] accessed its computer system without authorization." *Id.* Thus even where the employee allegedly blatantly used her password to steal information and send it to a competitor (which was plainly access under false pretenses and beyond the legitimate scope of her authorized access), there was no CADRA violation because there was no unauthorized access. *See id.* "The purpose of [CADRA] is to safeguard computer systems **against unauthorized access** . . ." *Id.* (emphasis added). As long as the access was authorized, there is no CADRA claim. Access "under false pretenses" or "beyond the scope of authorized access" was insufficient to state a CADRA claim in *Grow Fin. Fed. Credit Union*, and it is insufficient here as well. Kipu does not allege that Defendants actually accessed its system in 2013-2014 without an authorized username and password, which is required to state a CADRA claim. Accordingly, summary judgment should be entered on Kipu's CADRA claim.

### ii. ZenCharts Was Not In Existence In 2013-2014 And Cannot Be Liable for the 2013-2014 Access

Additionally, Kipu cannot prevail on claims against ZenCharts for access between October 10, 2013 and January 19, 2014 because ZenCharts did not exist during that timeframe. Kipu correctly alleges that ZenCharts was organized on September 14, 2015—over 18 months after the last purported 2014 login. *See* Amended Complaint at ¶¶ 102 and 128. Kipu does not allege any theories of successor liability or promoter liability against ZenCharts. Kipu has not offered any evidence that ZenCharts actually logged into Kipu's system between October 10, 2013 and January 16, 2014—and no such evidence exists. As a result, summary judgment should be entered in ZenCharts favor on this basis as well.

### b. Kipu's Customers Authorized Defendants' 2015 Access and, Thus, Kipu's 2015 Access Claims Fail

Kipu alleges that "[b]etween September 10, 2015 to early October 2015, [Dan Callahan, Sean Callahan, Glaser and Karkalichev] again accessed the Kipu EMR System . . . after obtaining a username and 'Super Admin' log-in rights through a Kipu client." ("2015 Access") Amended Complaint at ¶ 59, 129. According to Kipu, this allegation relates to two clients of Kipu that were considering switching to ZenCharts, Ocean Breeze and the Pathway to Hope. *See*

30(b)(6) Deposition of Kipu at p. 90., ll 6-13. However, Defendants' 2015 Access was with authorization because Defendants were undisputedly given express permission from Kipu's customers to access their accounts in the Kipu system to move their data out of the Kipu system.

Kipu admits that its customers, like Ocean Breeze and Pathway to Hope, own the data and forms that they put into the Kipu EMR System. *See* 30(b)(6) Deposition of Kipu, at p. 58, l. 23 – p. 60, ll. 9. Kipu also admits that its customers are entitled to remove that data and those forms and transfer those data and forms from Kipu to another EMR provider. *See* 30(b)(6) Deposition of Kipu, at p. 60, ll. 15-22; p. 68, ll. 3-8.

Ocean Breeze and Pathway to Hope were unhappy Kipu customers who wanted to move to ZenCharts. Ocean Breeze and Pathway to Hope provided ZenCharts with a username and password in order to transfer their data and forms from Kipu to ZenCharts. *See* 30(b)(6) Deposition of Kipu at p. 65, ll. 3 – p. 66, ll. 3; Depo. Ex. 77 and 78; Depo. Ex. 89, at Zen 18. Kipu's designated representative testified that Ocean Breeze and Pathway to Hope "had their own forms that they used and put into [Kipu's] system." *See* Transcript of Kipu at p. 90, ll. 6-13. Kipu acknowledged that those forms were part of Ocean Breeze and Pathway to Hope's data, and that Ocean Breeze and Pathway to Hope owned their data. 30(b)(6) Deposition of Kipu at p. 66, ll. 10-22.

Both Ocean Breeze and Pathway to Hope testified that they authorized Defendants to access their Kipu accounts on their behalf. Ocean Breeze acknowledged that it "authorize[d] ZenCharts and its people to access the Ocean Breeze account in the Kipu system on Ocean Breeze's behalf," and that "Ocean Breeze provide[d] a username and password for ZenCharts and its people to use for that purpose." *See* 30(b)(6) Deposition of Ocean Breeze at p. 43, ll. 9-21. Similarly, Pathway to Hope affirmed that it "authorize[d] ZenCharts and its people to access the Pathway account in the Kipu system" and that "Pathway provide[d] a username and password for ZenCharts." *See* 30(b)(6) Deposition of Pathway to Hope at p. 25, ll. 9-25.

Kipu has conceded that "Pathway [to Hope] and Ocean Breeze created usernames and passwords for Sean Callahan[.]" 30(b)(6) Deposition of Kipu at p. 65, ll. 3 – 66, ll. 3; Depo. Ex. 77 and 78. When Defendants signed into these customers' accounts, they did so on behalf of the client with a username and password provided by the client, to access the client's information. *See id.*

CADRA defines "[w]ithout authorization" to mean "access to a protected computer by a person who:"

>   (a)    Is not an authorized user;
>
>   (b)    Has stolen a technological access barrier of an authorized user; or
>
>   (c)    Circumvents a technological access barrier on a protected computer without the express or implied permission of the owner, operator, or lessee of the computer or the express or implied permission of the owner of information stored in the protected computer.

Fla. Stat. § 668.802(9)(a)-(c). As set forth below, none of the three categories of access "without authorization" are present in this case, and Kipu cannot prevail on its CADRA claim for the 2015 Access.

### i.    Defendants Were Authorized Users

As for CADRA's first manner of access "without authorization," Defendants were "authorized users" under the statute because Kipu's customers gave them access in order to move the customers' data from Kipu to ZenCharts. CADRA defines "authorized user" to include a "third-party agent . . . of . . . the owner of information stored in the protected computer if the . . . third-party agent . . . is given express permission . . . by the owner of information stored in the protected computer to access the protected computer through a technological access barrier." Fla. Stat. § 668.802. A technological access barrier is defined as "a password, security code, token, key fob, access device, or similar measure." Fla. Stat. § 668.802(7). In other words, a person is an authorized user if (i) the owner of information stored in a protected computer (ii) gives its agent permission to access the protected computer via password. *See id.*

Ocean Breeze and Pathway to Hope were owners of the information stored in Kipu's EMR system, and were entitled to access and move that data to a competing EMR system if they wanted to. *See* 30(b)(6) Deposition of Kipu, at p. 58, l. 23 – p. 60, ll. 9; 30(b)(6) Deposition of Kipu, at p. 60, ll. 15-22; p. 68, ll. 68, ll. 3-8.  The first element is met.

The second element – express permission via password – is met because Ocean Breeze and Pathway to Hope gave ZenCharts (and its agents) permission to access Kipu's allegedly protected EMR system via password. *See* 30(b)(6) Deposition of Kipu at p. 65, ll. 3 – p. 66, ll. 3; Depo. Ex. 77 and 78; Depo. Ex. 89, at Zen 18. In both cases, the Kipu customer created a

username and password for ZenCharts, and expressly authorized it to use that username and password to access the Kipu account. *See* 30(b)(6) Deposition of Kipu at p. 65, ll. 3 – p. 66, ll. 3; Depo. Ex. 77 and 78; Depo. Ex. 89, at Zen 18. Ocean Breeze and Pathway to Hope testified that they authorized ZenCharts to access Kipu's EMR system to transfer their data to ZenCharts' EHR System, and provided ZenCharts and its agents with usernames and passwords to access Kipu's EMR system. *See* 30(b)(6) Deposition of Ocean Breeze at p. 43, ll. 9-21; 30(b)(6) Deposition of Pathway to Hope at p. 25, ll. 9-25. Indeed, Kipu admits that "Pathway [to Hope] and Ocean Breeze created usernames and passwords for Sean Callahan" and that Sean Callahan was "authorized by the customers" to access the system. 30(b)(6) Deposition of Kipu at p. 61 ll. 15-18; *see also* Exhibits 77-78. Ocean Breeze and Pathway to Hope undisputedly gave their agent, ZenCharts, permission to access Kipu's EMR system through a password. This is all that is required to make ZenCharts and its agents "authorized users" under CADRA.

Kipu attempts to work around the plain language in CADRA by "argu[ing] that Sean [Callahan]'s access exceeded the scope of the authorized access under the [Terms of Service]." *See* 30(b)(6) Deposition of Kipu at p. 61, ll. 22-25. In other words, Kipu concedes that the access to the Ocean Breeze and Pathway to Hope accounts was authorized by those customers, but contends that ZenCharts and Callahan exceeded the authorized scope of that access by copying and stealing the Kipu system.[3] But Kipu offers no support for its proposition that the plain language of the CADRA statute can be ignored. CADRA and the cases construing it reject Kipu's argument. *See Grow Fin. Fed. Credit Union*, No. 8:17-CV-1239-T-30JSS, 2017 WL 3492707, at *2 (holding that employees access to work computer with intent to steal trade secrets and send them to a competitor was not a CADRA violation because the employee was authorized to access the system). Kipu may attempt to cite to the Consumer Fraud and Abuse Act ("CFAA") and cases construing CFAA, but the CFAA provides for a cause of action when a person "**intentionally exceeds an authorization to access**" a computer facility. 18 U.S.C § 2701(a)(2) (emphasis added). Kipu did not bring a CFAA claim.

---

[3]     Of course, Defendants vehemently dispute that they copied or stole anything during the 2015 Access or the 2013-2014 Access. In fact, the undisputed evidence is that Kipu has no idea what was undertaken during those periods of access. But for summary judgment, even if those facts were true (and they were not), they do not amount to a violation of CADRA.

CADRA, on the other hand, does not prohibit access that allegedly exceeds authorization. *See* Fla. Stat. §§ 668.801-668.805. Kipu cannot twist a purported violation of a contractual limitation into a CADRA claim, allowing itself all of the remedies that CADRA authorizes to deter computer hacking.

ii.    **Kipu Does Not Allege Theft of a Password, or "Technologic Access Barrier"**

Kipu does not allege that Defendants stole the password of an authorized user in 2015 (and Defendants did not steal any password), so the second method of showing unauthorized access is not at issue.

iii.    **Kipu Does Not Allege "Circumvention" of a Password or "Technologic Access Barrier," and ZenCharts Had Permission From The Owner of Information**

Kipu does not allege that Defendants "circumvented" a password or "technologic access barrier." Instead, Kipu concedes that the access was authorized, but argues that Defendants exceeded the scope of that authorized access. But even if Kipu had alleged such facts, Kipu cannot establish the third method of showing unauthorized access because Defendants had permission of the owners of the information on the system. A CADRA claim requires proof that that access was without "the express or implied permission of the owner of information stored in the protected computer." *See* Fla. Stat. § 668.802(9)(c). If the password is provided by the owner of information stored, then access is allowed. *See id.* As discussed above, it is undisputed that Ocean Breeze and Pathway to Hope were the owners of the information that accessed ZenCharts' on Kipu's EMR system. *See* 30(b)(6) Deposition of Kipu at p. 60, ll. 4-6. Ocean Breeze and Pathway to Hope provided ZenCharts with a username and password in order to transfer their client files from Kipu to ZenCharts. *See* 30(b)(6) Deposition of Kipu at p. 66, ll. 4-22. And, as a result, ZenCharts' access to Kipu's EMR System did not violate CADRA.

For all of these reasons, this Court should grant summary judgment in Defendants' favor on Count I.

**Count XIV: Breach of 2013 Terms of Service**

Kipu also claims that Solutions, Sean Callahan, Dan Callahan, Glaser, Karkalichev, Website Consultants, and ZenCharts breached the 2013 Terms of Service because according to Kipu, (1) the 2013 Terms of Service were incorporated into the Kipu Contract with Solutions

(Amended Complaint at ¶ 26-28); and/or (2) the Defendants agreed to the 2013 Terms of Service when they accessed the Kipu system while those Terms of Service were in effect. *Id.* at ¶ 251. However, neither of those arguments passes muster.

First, the Kipu contract never properly incorporated 2013 Terms of Service, Kipu never provided Solutions with a copy of those terms, and Solutions never agreed to the terms. Second, the 2013 Terms of Service are not binding on those who allegedly accessed the Kipu system because there was no valid click wrap agreement. Third, there is no evidence that ZenCharts or Rick Glaser accessed the Kipu system while the 2013 Terms of Service were in effect and, thus, at a minimum these particular Defendants are entitled to summary judgment on this claim. Finally, even if the 2013 Terms of Service were properly incorporated into Solutions' contract with Kipu, the 2013 Terms of Service do not bind the remaining Defendants, since Solutions was the disclosed principal and the remaining Defendants were simply agents of that disclosed principal.

### a.     The Kipu Contract Did Not Properly Incorporate the 2013 Terms of Service

Solutions did not agree to any Terms of Service, was never provided any Terms of Service, and never discussed any Terms of Service with Kipu. *See* Deposition of Glaser at p. 38, ll. 22-25; p. 39, ll. 8-12. Solutions entered into the Kipu Contract, but the 2013 Terms of Service were not properly incorporated into the Kipu Contract. *See* DE 118-1. Kipu did not attach the Terms of Service to the Kipu Contract. *See* Deposition of Glaser at p. 38, ll. 22-25. Just a week or so before the Solutions engagement with Kipu, Kipu did attach the terms of service as a section in the customer contract, provided the customers with the actual terms, and sought (and received) the customer's consent to those terms. But Kipu changed that process prior to the Solutions' engagement. 30(b)(6) Deposition of Kipu, at p. 101, ll. 12 - p. 102, ll. 11. Had the Kipu Contract been executed only a week or two before, the terms of service would have been provided as an actual part of the Kipu Contract. But they were not.

Instead, Kipu sought to bind Solutions to the 2013 Terms of Service by referring Solutions to its website. The Kipu Contract stated that "Kipu's Terms of Service or 'TOS,' available online at http://kipusystems.com/terms, are part of this agreement and take precedence over any other agreements . . ." and that "the most current version of the TOS shall apply and that those TOS may be revised by us from time to time, without prior notice." Kipu Contract, DE 118-1, § 6.

Under Florida law, in order for a contract "to incorporate by reference a collateral document, the incorporating document must (1) specifically provide 'that it is subject to the incorporated [collateral] document' and (2) the collateral document to be incorporated must be 'sufficiently described or referred to in the incorporating agreement' so that the intent of the parties may be ascertained." *BGT Group, Inc. v. Tradewinds Engine Services, LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011) (quoting *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993)). In *BGT Group*, an invoice was provided to a buyer which stated that "ALL ORDERS ARE SUBJECT TO ATTACHED BGT TERMS AND CONDITIONS." *Id.* (emphasis in original). The Terms and Conditions were not attached, and the seller "failed to provide the terms and conditions during the negotiating process; thus, the sales contract was formed without [the buyer] ever having seen them." *Id.* at 1194-95. The court found that the terms and conditions were not sufficiently described because the seller "did not provide a specific description of them or attach them to the" invoice. *Id.* at 1195.

Even closer to the case at bar, in *Affinity Internet, Inc. v. Consol. Credit Counseling Servs., Inc.*, 920 So. 2d 1286 (Fla. 4th DCA 2006), the parties entered into a written contract that stated "[t]his contract is subject to all of [the drafter's] terms, conditions, user and acceptable use policies located at http://www.skynetweb.com/company/legal/legal.php." *Id.* at 1287.  In finding that there was no agreement, the court held that "[n]ot only was the collateral document not attached to the contract, but [the non-drafting party] also was never at any time subsequent to the signing of the contract given a copy of the collateral document or the information contained therein." *Id.* at 1288. As in *Affinity Internet, Inc.*, Solutions signed a printed version of the Kipu Contract, which stated that "[t]he Kipu Systems 'terms of service' [], available online at http://kipusystems.com/terms, are part of this agreement." Kipu did not attach the 2013 Terms of Service to the Kipu Contract. *See* Deposition of Glaser at p. 38, ll. 22-25. And Kipu has no evidence that it provided Solutions a copy of the 2013 Terms of Service at the relevant time— upon execution of the Kipu Contract. Instead, Kipu attempted to slip ever-changing Terms of Service into the negotiated Kipu Contract solely by typing a hyperlink into the Kipu Contract. As a result, Kipu's attempt to Solutions to collateral term and conditions fails as a matter of law.

Finally, because the Kipu Contract reserved the right to unilaterally change the terms of service without any notice, the entire contract was illusory. "Where a party reserves its right to modify a contract, that reservation must be subject to certain limitations, otherwise the contract is

illusory." *Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014). A "party can only reserve its right to unilaterally change a contract where that reservation is subject to limitations, such as reasonable notice." *Id.* (citing *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 376 (S.D.N.Y. 2010)). Because Kipu attempted to reserve the unfettered right to change the terms of the contract at will, "without prior notice," *see* DE118-1, § 6, there was no enforceable contract at all.

        **b.**       **The 2013 Terms of Service Were Not a Valid Click Wrap or Browse Wrap**

The remaining basis for imposition of the 2013 Terms of Service was that some of the Defendants accessed the Kipu system while those terms of service were in effect. "[M]utual assent is a prerequisite for the formation of any contract." *Compass iTech, LLC v. eVestment Alliance, LLC,* No. 14-81241-CIV-MARRA/MATTHEWMAN, 2016 WL 10519027 (S.D. Fla. June 24, 2016) (quoting *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014)). Kipu does not claim that Defendants signed the 2013 Terms of Service; instead, Kipu argues that Defendants are nonetheless subject to the 2013 Terms of Service because it was a "clickwrap" agreement. *See* Amended Complaint at ¶ 131 [DE 118]. In other words, Kipu claims that users were required to agree to the terms of service to log in to the Kipu EMR. *See id.*

Under Florida law, there are two potential ways to obligate an end user to terms of service. "On the internet, the primary means of forming a contract are so-called 'clickwrap' agreements, in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use, and 'browsewrap' agreements, where website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the website's home page." *Compass iTech,*, 2016 WL 10519027, *15. Kipu's log in screen applicable to the 2013 Terms of Service does not comport with either of those definitions. The log in screen produced by Kipu for the 2013-2014 time period, during which the 2013 Terms of Service were allegedly in effect, is as follows:

Sylint Report, at p. 19. The above log in screen is not a "clickwrap." *Compass iTech,*, 2016 WL
10519027, *15. The user is not presented with the terms and conditions, there is no box
signifying "I Agree," and no check in that box saying that the user expressly agrees to those
terms of service. While the above log in screen does indicate that "[b]y selecting 'Sign In' above,
you indicate that you . . . agree to The Kipu Systems Terms of Use," the terms and conditions are
not presented on the screen as they are in "clickwraps." The click box says "Sign In" and not "I
Agree." The language notifying the user that she has agreed to terms of use is in smaller font
three lines below the "Sign In" box. The user could easily click "sign in" without seeing or
knowing that they have agreed to terms of use. The "clickwrap" avoids any such confusion, but
Kipu chose not to include a "clickwrap."

Kipu was and is aware of web applications and web software which contain a
"clickwrap," like Apple, where the user is presented with all of the terms of service, must scroll
through the terms of service, and then must click a box saying "I agree" to those terms of service.
30(b)(6) Deposition of Kipu, at p. 133, ll. 16 – p. 134, ll. 6. There was nothing like that required
for Solutions or the 2013 Terms of Service. *Id*.

Kipu's log in screen is also not a "browsewrap." A browsewrap includes a hyperlink on
the log in screen or at the bottom of the website's home page which takes the user to the terms
and conditions. *Compass iTech,*, 2016 WL 10519027, *15. In the live instance that Kipu
produced for the time period when the 2013 Terms of Service were allegedly in effect, there was

no hyperlink to any terms of service on the log in screen. 30(b)(6) Deposition of Kipu, at p. 31 ll. 13-16. In fact, on the Kipu website at the time the 2013 Terms of Service were purportedly in effect, there was no hyperlink to the terms of service at all. 30(b)(6) Deposition of Kipu, at p. 34 ll. 1-21. To find the 2013 Terms of Service, one would have to go to the Kipu website, enter a search term for the terms of service, and then review the terms of service page. *Id.*

Because the Kipu log in screen was neither a "clickwrap" nor a "browsewrap," the 2013 Terms of Service are not enforceable as a matter of law. *See IT Strategies Group, Inc. v. Allday Consulting Group, L.L.C.*, 975 F. Supp. 2d 1267, 1283 (S.D. Fla. 2013) (where the website "simply informed the user that he or she agreed to any confidentiality and security requirements that the Plaintiff might impose for use of their product" but "contained no hyperlink to the online user agreement," the website user did not consent to the agreement); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 430 (2d Cir. 2004) (holding that there was no consent to terms because "no hyperlink is provided where one could view the proposed license terms.").

 **c.**  **ZenCharts and Glaser Did Not Log In Under The 2013 Terms of Service**

Kipu's claim that ZenCharts and Glaser breached the 2013 Terms of Service also fails because there is no evidence that ZenCharts or Glaser logged into Kipu's EMR System while the 2013 Terms of Service were in effect. ZenCharts was not even formed when this contract was signed—the 2013 Terms of Service ended January 6, 2014, and Kipu admits that ZenCharts was not organized until September 14, 2015. *See* Amended Complaint at ¶ 105. Glaser did not log into the ZenCharts System in 2013; Kipu's purported login sheet shows Glaser's only login taking place on January 15, 2014 (when the 2014 Terms of Service had replaced the 2013 Terms of Service). *See* Ex. 18 at p. 17. Thus, ZenCharts and Glaser are entitled to summary judgment on Kipu's claim that they breached the 2013 Terms of Service.

 **d.**  **Remaining Defendants Were Disclosed Principals of Solutions and Are Not Liable**

Kipu seeks to hold the remaining Defendants liable under the 2013 Terms of Service, but those remaining Defendants were merely agents of the disclosed principal, Solutions, assisting in the implementation of the Kipu system at Solutions. "In Florida, the law is well settled that an agent is not personally liable for the contract debts of a disclosed principal, absent an express agreement to the contrary." *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 874 (11th Cir. 2011). "If the contracting party knows the identity of the principal, the principal is deemed

disclosed." *Id.* In *BMMSOFT, Inc. v. White Oaks Tech., Inc.*, No. C-09-4562, 2010 WL 3340555 (N.D. Cal. Aug. 25, 2010), the court found that where a company purchased a computer program on behalf of the United States, who was ultimately the licensee, the purchaser was not liable because it was a disclosed agent rather than the principal. *See id.* at *2–4. Even though the purchaser clicked "I Accept" when installing the software, it was not found liable because the intent was for the license to be used by the United States. *Id.* The court found it notable that the term "you" was defined in the terms of service as the licensee, not the person signing in. *Id.*

Here, the Kipu Contract is between Kipu and Solutions. *See* DE 118-1. The 2013 Terms of Service are allegedly applicable to the remaining Defendants as a result of the incorporation of those terms into the Kipu Contract. *See* Amended Complaint at ¶ 27. All of those who allegedly accessed the Kipu system during the failed Kipu implementation were acting as agents of Solutions. Dan Callahan, Sean Callahan, Glaser, Website Consultants, and Karkalichev were authorized by Solutions to access the Kipu system on Solutions' behalf, and were provided usernames and passwords by Kipu and then Solutions. *See* Deposition of Glaser at p. 139, l. 13 - p. 146, l. 7. Thus, if there was a breach of the 2013 Terms of Service, Solutions, as the disclosed principal, would be the only party liable, but the remaining Defendants would not. For this reason, if the 2013 Terms of Service are enforceable at all (and they are not), they are only enforceable against Solutions.

## Count III: Defendants' Are Not Bound By The 2014 Terms Of Service

Kipu also claims that Solutions, ZenCharts, Website Consultants, Glaser, Sean Callahan, Dan Callahan, and Karkalichev breached the 2014 Terms of Service. *See* Count III, Amended Complaint, ¶¶ 146-154 [DE 118]. But the 2014 Terms of Service were not in effect at the time the Kipu Contract was signed, were imposed by Kipu unilaterally and without notice, and did not come into effect until January 6, 2014. *See* Amended Complaint at ¶ 29. No Defendant ever agreed to the 2014 Terms of Service. Again, Kipu says that those terms of service apply to Defendants because they were incorporated in the Kipu Contract and because Defendants accessed to the Kipu system after January 6, 2014.

However, none of the Defendants are bound by the 2014 Terms of Service because (1) they never consented to the terms, and (2) Defendants were disclosed principals of Kipu's customers (either Solutions or, later, Ocean Breeze and Pathway to Hope) and thus cannot be liable for any breach of those terms.

a.     **Neither Solutions Nor Any Other Defendant Consented To the 2014 Terms of Service**

Defendants did not consent to the allegedly amended Terms of Service.  The contract between Kipu and Solutions was executed on October 8, 2013. *See* DE 118-1.  The disastrous implementation of the Kipu system occurred during October 2013 and early November 2013. On November 19, 2013 and November 26, 2013, Solutions notified Kipu that "we have decided to put your service on hold" and "we are not going to be using the product, and we need to pause the service." Exhibits E and F. Solutions refused to make the first monthly payment due after December 1, 2013, and never made another payment. *See* Amended Complaint, [DE 118], at ¶ 144; 30(b)(6) Deposition of Kipu, at p. 132, ll. 17-22. During this period, Solutions continued to access the Kipu system in order to retrieve critical client information necessary for the treatment of its clients, to remove Solutions' own data from the Kipu EMR System, and to investigate whether the Kipu EMR System was capable of supporting Solutions' needs (which Kipu and Fiorention continued to urge Solutions that it could).

As discussed above, Solutions never agreed to the 2013 Terms of Service in the first place.  And what is more, Kipu never notified Solutions that the 2013 Terms of Service were being amended. *See* 30(b)(6) Deposition of Kipu, at 126, ll. 3 – 23; *see also* March 18, 2018 Declaration of Glaser at ¶¶ 14-19. At the time, Kipu had approximately 35 customers. 30(b)(6) Deposition of Kipu at 126, ll. 24 – p. 127, ll. 8. Not only did Kipu know who all 35 of its customers were, Kipu also maintained the email addresses of every user of the Kipu system. *Id*. at 127, ll. 14-18. Yet, Kipu never notified the customers or the users that the term of service were changing. 30(b)(6) Deposition of Kipu, at p. 126, ll. 3 – 23.  Likewise, Kipu never provided any notice on its website, or on the log in screen, that its terms of services were changing. *Id*.

Kipu never sought Solutions' consent to any change in the terms of service, and those changes are not binding on Solutions, or any other Defendant, without such consent. Solutions did not agree to the 2014 Terms of Service by signing its contract with Kipu because the provision allowing unilateral amendment of the Terms of Service without prior notice is invalid as a matter of law. The Kipu Contract stated that "Kipu's Terms of Service or 'TOS,' available online at http://kipusystems.com/terms, are part of this agreement and take precedence over any other agreements," and that "the most current version of the TOS shall apply and that those TOS may be revised by us from time to time, without prior notice." *See* DE 118-1 at § 6. However,

this provision of the Kipu Contract, which permits Kipu to unilaterally change the terms of the contract, is illusory as a matter of law. *Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014). A "party can only reserve its right to unilaterally change a contract where that reservation is subject to limitations, such as reasonable notice." *Id.* (citing *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 376 (S.D.N.Y. 2010)). For example, a contract that is subject to modification can be non-illusory when it provides customers with advance notice and an opportunity to reject proposed changes. *See id.* But a contract is illusory "where defendant had reserved its right to unilaterally, and without notice, change" elements of the contract. *Id.* (citing *Hancock v. Am. Tel. & Tel. Co.*, 804 F. Supp. 2d 1196, 1210 (W.D. Okla. 2011)). In *Diverse Elements*, the plaintiff "improperly attempted to 'reserve[ ] the right to modify the Terms of Service at any time, and without notice.'" *Id.* The court held that "[t]his reservation is invalid as a matter of law and cannot bind [defendant] to altered terms without having given [defendant] notice of the alteration or the opportunity to reject the modification." *Id.* The clause in this case is identical—it states that Kipu's "[Terms of Service] may be revised by us from time to time, without prior notice." Under *Diverse Elements*, the 2013 Terms of Service and Kipu's attempt to dramatically alter the 2013 Terms of Service in January 2014 without notice are both invalid. Pursuant to *Diverse Elements*, these unilateral revisions to the contract are unenforceable.

> **b.    Dan Callahan Never Accessed Kipu While The 2014 Terms of Service Were in Effect**

Kipu seeks to impose liability against all Defendants based upon the 2014 Terms of Service when it simply cannot prove access by each and every Defendant for the time periods referenced. For example, according to Kipu's own logs for the Solutions' account,[4] Dan Callahan last logged in to the Kipu System on November 15, 2013. Depo. Ex. 18, at p. 6. Taking Kipu's

---

[4]     Defendants dispute the accuracy of Kipu's logs of Defendants' access to the Kipu System. For example, the logs contain multiple "log ins" in a row without "log outs" and multiple "log outs" in a row without a corresponding "log in." Depo. Ex. 18. Moreover, according to Kipu's logs, Sean Callahan and Karkalichev never logged out of the Kipu system, and, according to the log at least, are still logged in today. However, even the logs taken as true, demonstrate that, among other things, Dan Callahan did not log in while the 2014 Terms of Service were purportedly in effect and Rick Glaser did not log in while the 2013 Terms of Service were in effect. Thus, at a minimum, those individual defendants cannot be sued for violation of those terms.

22

own evidence as true, there is no proof that Dan Callahan logged in to the Kipu system after January 6, 2014, when the Kipu 2014 Terms of Service allegedly took effect. Thus, at a minimum Dan Callahan is entitled to summary judgment on Kipu's claims for breach of the 2014 Terms of Service.

> ## c.    The Remaining Defendants Were Agents of Kipu's Customers, Solutions and, Later, Ocean Breeze and Pathway to Hope, Who Were Disclosed Principals

Kipu also attempts to bind Defendants to the 2014 Terms of Service even though they were acting as agents of disclosed principals, Kipu's customers. The remaining Defendants were either assisting Solutions during the Kipu implementation, or Ocean Breeze and Pathway to Hope during their transition from Kipu to ZenCharts. In both instances, the remaining Defendants were acting as agents on behalf of Kipu's customers, who had contracts with Kipu and were known, disclosed principals. As discussed above, under Florida law, an agent is not personally liable for contractual liability of a disclosed principal. *Validsa, Inc.*, 424 F. App'x at 874. Likewise, the mere fact that an agent of a disclosed principal clicks an "I Accept" button when installing software does not create independent liability for the agent. *See BMMSOFT, Inc.*, 2010 WL 3340555, at *2–4. The principal remains the only party liable, especially where, as here, the term "you" is defined in the terms of service as the licensee, not the user. *Id.*

Here, Defendants allegedly used logins that were either created by Solutions (during the Kipu implementation) or Ocean Breeze and Pathway to Hope (during their transition from Kipu to ZenCharts). *See* 30(b)(6) Deposition of Kipu at p. 65, ll. 15-25 – p. 66, ll. 1-3. Indeed, Kipu acknowledged that "Pathway [to Hope] and Ocean Breeze created usernames and passwords for Sean Callahan[.]" *Id.* at p. 65, ll. 15-25 – p. 66, ll. 1-3. When Defendants signed in, they did so with a client login, on behalf of the client, to access the client's information. *See id.* Notably, Kipu's 2014 Terms of Service state that "[t]he following terms and conditions constitute the 'Terms of Service,' are part of Your Contract with Kipu Systems, LLC, and govern Your acquisition and use of all services provided by Kipu Systems, LLC." *See* DE 118-3 at p. 1. The 2014 Terms of Service go on to state that "'You' or 'Your' as used hereunder refers to **the company or other legal entity for which You are accepting this Agreement**, and Affiliates of that company or entity." *Id.* (emphasis added). Kipu's own 2014 Terms of Service state that they do not apply to agents acting on behalf of an entity, as the remaining Defendants were acting on

behalf of Solutions, Pathway to Hope and Ocean Breeze. In *BMMSOFT, Inc.,* the definition of "you" in the terms of service was the linchpin for retaining liability for the disclosed principal, and rejecting liability for the agent. *See* 2010 WL 3340555, at \*2-4.  The same logic applies here.  Thus, if anyone is liable under the 2014 Terms of Service, Kipu's customers are, and the agents of those customers (the Defendants other than Solutions) are not.

## Count XI: Florida Common Law Unfair Competition

Kipu's common law unfair competition claim fails because Kipu's claim for unfair competition under the Lahman Act (Count X) also fails. The Eleventh Circuit recently stated "that the elements of trademark infringement under common law and the Lanham Act 'are the same,' and that 'an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim.'" *Hard Candy, LLC, v. Anastasia Beverly Hills, Inc.*, No. 18-10877, 2019 WL 1771292, at \*2 (11th Cir. Apr. 23, 2019) (quoting *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 n.14 (11th Cir. 1989)). Where a defendant "is unable to bring an unfair competition claim under the Lanham Act under the theory of either false advertising or trademark infringement, it follows that the common law claims based on unfair competition and trademark infringement must fail as well." *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n. 4 (11th Cir. 2001)). Here, Kipu's unfair competition claim is based solely on alleged false advertising and trademark infringement. Kipu alleges that Defendants' "actions regarding the advertising, marketing, offer for sale and sale of EMR software in the drug and alcohol addiction treatment industry constitutes unfair competition and an infringement of Kipu's common law rights in the name OTO." Amended Complaint at ¶ 228 [DE 118]. Kipu also alleges that it has been damaged by Defendants' actions "including, but not limited, the adoption and continued use of the mark OTO with regards to selling and offering its competing line of EMR software." *Id.* at ¶ 229. In short, Kipu alleges that ZenCharts' use of the term "OTO" violated its trademark rights, resulting in unfair competition.

As set forth in the next section, Kipu is unable to bring an unfair competition claim under the Lanham Act in Count X, as Kipu has implicitly conceded by seeking to voluntarily dismiss that count. As described in more detail below, Kipu cannot prevail on either a "passing off" theory or a wrongful association theory under the Lanham Act. The former fails because there is no evidence that ZenCharts has ever "passed off" its product as Kipu's. Likewise, the wrongful

association theory fails because Kipu did not have any trademark rights in the "OTO" term, and there was no likelihood of confusion in the joint use of the unregistered term. Nor has Kipu alleged any damages from ZenCharts' brief use of the "OTO" term. Because there is no basis for a statutory unfair competition claim based upon trademark infringement, there is no basis for Kipu's common law unfair competition claim. Accordingly, Defendants are entitled to summary judgment on Kipu's common law unfair competition claim.

### _Count X: Federal Unfair Competition, Passing Off, under 15 U.S.C. § 1125(a)_[5]

Kipu's Count X (Lanham Act unfair competition) is duplicative of Kipu's Count XI (common law unfair competition), and both fail to state a valid cause of action. Kipu attempts to state a claim for "unfair competition, passing off" under 15 U.S.C. § 1125(a), but it is unclear which theory is being asserted. There are multiple theories under this statute, and Kipu's Amended Complaint appears to conflate several. As set forth below, each potential theory fails as a matter of law. And, in any court,  Kipu cannot show any damages.

Kipu claims that its system had a feature called "OTO" (short for "One Time Only"), which restricts a patient to "one time only" admission at a facility, and flags that patient later if he/she attempts to re-admit. _See_ Amended Complaint at ¶¶ 11-13 [DE 118]. At the specific request of a customer, ZenCharts's EHR system adopted a similar feature in November 2015 and briefly called that feature OTO. _See_ Deposition of Glaser at p. 79, ll. 19-25. To see the "OTO" reference in the ZenCharts system for the brief time it was used, one would have to be a customer or a potential customer of the ZenCharts system. 30(b)(6) Deposition of Kipu, at p. 145, ll. 20-24. In other words, ZenCharts never used the term "OTO" outside its system, or marketed that feature outside of its system.

When ZenCharts learned that Kipu used the term "OTO," ZenCharts decided to change the name of that feature in the ZenCharts EHR, and it did so on October 31, 2016. _See_ Deposition of Glaser at p. 80, ll. 11-17; _see also_ October 28, 2016 Rick Glaser Email, Exhibit L. Thus, ZenCharts used the same name as Kipu for this feature for less than a year.

Kipu did not register this trademark until January 24, 2017. _See_ Amended Complaint at ¶ 207; 30(b)(6) Deposition of Kipu, at p. 140, ll. 6-8. ZenCharts did not use the term "OTO" in its

---

[5]        Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. _See_ DE 156.

EHR software at any time on or after January 24, 2017, and has no intention to use the term OTO in the future. *See* March 23, 2018 Declaration of Glaser at ¶ 24.

Kipu's use of "OTO" was not distinctive in the market. Kipu is not aware of any customer testimonial about the Kipu product which references "OTO." 30(b)(6) Deposition of Kipu, at p. 146, ll. 17-21. Other than a single pamphlet, Kipu has not identified any marketing material that referenced "OTO." 30(b)(6) Deposition of Kipu, at p. 146, ll. 22 – p. 148, ll. 7. Currently, there is no reference to "OTO" on Kipu's website. 30(b)(6) Deposition of Kipu, at p. 149, ll. 6-17.

Nor has there been any confusion or damage that resulted from ZenCharts' brief use of "OTO." Kipu is not aware of any customer that was confused by ZenCharts' brief use of "OTO." 30(b)(6) Deposition of Kipu, at p. 146, ll. 13-16. Nor are there any market studies or other information demonstrating that there was actual or potential confusion in the marketplace. 30(b)(6) Deposition of Kipu, at p. 154, ll. 10 – 20. Kipu cannot identify a single customer it lost as a result ZenCharts' fleeting use of the "OTO" mark. 30(b)(6) Deposition of Kipu, at p. 153, ll. 15 – p. 154, ll. 9.

### a.    Kipu's "Passing Off" Theory Is Inapplicable

Kipu titles its Lanham Act claim as one for "passing off," but the theory is not applicable to the facts in this case. A "passing off" claim arises when a seller represents that a product was created by a more reputable company (to pass off the "origin" of the product). As a classic example, a manufacturer of cheap watches violates the statute when it sells watches branded "Rolex" to try to trick the customer into believing they are buying a watch manufactured by Rolex. "The Supreme Court has made clear that, in the context of a 'passing off'/'false designation of origin' claim under section 43(a), the use of the word 'origin' refers to a false or misleading suggestion as to 'the producer of the tangible goods that are offered for sale.'" *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 (11th Cir. 2007) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003)). "In other words, a passing off claim requires a showing that the defendant falsely represented that the plaintiff was the 'source' of the goods when it was not, that is, that it falsely suggested that the plaintiff was 'the producer of the tangible product sold in the marketplace.'" *Id.* In *Optimum Techs,* a manufacturer made carpet adhesive, and entered into an agreement with a distributor to sell the adhesive to big-box stores, like Home Depot. *Id.* at 1235-36. The distributor eventually

made a competing product, using a nearly identical box (but containing the distributor's logo), and sold it to the same big-box stores. *Id.* at 1236. The manufacturer sued the distributor under a variety of theories, including "passing off." *Id.* at 1248. The Eleventh Circuit affirmed entry of summary judgment in favor of the distributor, noting that "**the record is bereft of any evidence that [distributor] ever represented [its product] as being manufactured by anyone other than [distributor].**" *Id.* (emphasis added). The court held that "because [distributor] did not "misrepresent[ ][its] own goods or services as [being] someone else's," *i.e.* [manufacturer's], and because [distributor] did not falsely suggest that [manufacturer] was "the producer of the [product] sold in the marketplace,' [manufacturer] has failed to allege evidence to support a claim of 'passing off' . . . ." *Id.* Here, ZenCharts has never falsely suggested that its EMR product was produced by Kipu. *See* 30(b)(6) Deposition of Kipu p. 271, ll. 7-13. Not even close. ZenCharts is a competitor, with its own name prominently featured on nearly every page of its EMR system. In fact, Kipu is not mentioned on ZenCharts' EHR system. And the Amended Complaint makes it clear that ZenCharts was not attempting to sell the ZenCharts system as being made by Kipu—it was allegedly an aggressive competitor. *See, e.g.,* Amended Complaint at ¶ 63 (ZenCharts "began targeting the same clients as Kipu, offering them the copycat ZenCharts EMR system at a steep discount to the Kipu EMR System . . . within days and sometimes hours of Kipu speaking with the same potential clients."). ZenCharts was allegedly fighting Kipu for the same customers in open competition, not trying to pass off its product as being made by Kipu. The "passing off" claim is not applicable to the facts in this case.

     **b.**       **The Use of a Common Term in a Section of the Program is Not Passing Off**

Additionally, the allegation that ZenCharts' use of the term "OTO" inside one section of an older version of the EMR program, when Kipu also used the term, could qualify as "passing off" the *entire program* as being made by Kipu borders on the absurd. There is no support for the principle that similarity of a small portion of a system can give rise to a passing off claim for the entire system. This Court has faced a similar issue in a lawsuit by an app creator against a cell phone maker for featuring its app on the screen of the cell phone when being sold. *See Appjigger GmbH v. BLU Products, Inc.*, 15-22313-CIV, 2016 WL 4119720, at *3 (S.D. Fla. Mar. 7, 2016) (J. Williams). "The false designation of origin provision 'has been construed by the courts as creating a federal action for 'passing off,' which occurs 'when a producer misrepresents his own goods or services as someone else's.'" *Id.* (quoting *Optimum Techs., Inc. v. Henkel Consumer*

27

*Adhesives, Inc.*, 496 F.3d 1231, 1248 (11th Cir. 2007)). As this Court noted, "[a] passing off claim requires a showing that the defendant 'falsely suggested that the plaintiff was the producer of the tangible product sold in the marketplace.'" *Id.* (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003)). The Supreme Court has "held that 'origin of goods' in the Lanham Act § 43(a)(1)(A) [for passing off] did not refer to the author of any idea, concept, or communication **embodied in a good, but to the producer of the tangible good itself**." *Id.* at *3 (emphasis added) (quoting *Dastar Corp.*, 539 U.S. at 37). Kipu does not claim that ZenCharts sold its EMR program as being made by Kipu. *See* 30(b)(6) Deposition of Kipu at p. 271, ll. 7-13. Kipu merely contends that both systems used the term "OTO" inside the program. ZenCharts' mere alleged inclusion of a "OTO" radial box within its EMR system does not give rise to a claim for "passing off" as a matter of law.

### c.    Kipu's Wrongful Association Claim Fails Under Both Elements

Kipu also seems to allege "wrongful association" against ZenCharts under 15 U.S.C. § 1125(a). Kipu claims that "Defendants use a false or misleading description that is likely to cause confusion, and to cause mistake, and to deceive, as to the affiliation, connection, or association of ZenCharts System with Kipu." *See* Amended Complaint at ¶ 219. "To establish a prima facie case of trademark infringement under § 43(a) [15 U.S.C. § 1125(a)], a plaintiff must show '(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'" *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010) (citing *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir.1997)). As set forth below, neither element is met.

### i.    Kipu Did Not Have Trademark Rights In The OTO Mark

Kipu can only enforce its trademark if it had rights in the mark to begin with. And Kipu did not.

First, Kipu cannot establish that it had trademark rights in "OTO" at the time of the alleged infringement. The mark was not registered, and was not so associated as to qualify for protection as an unregistered trademark. Use of unregistered trademarks "can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." *Tana*, 611 F.3d 767,

776 (11th Cir. 2010) (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir. 1984)). "However, only those marks that are capable of distinguishing the owner's goods from those of others, *i.e.,* that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." *Id.* at 773; *see also Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir. 1956) ("15 U.S.C. § 1125(a) requires at least that the defendant be guilty of a false representation," and "[i]f the expressions used here by the defendant are not uniquely associated with the plaintiff's goods there is no such false representation."). If a mark is generic, or one "that suggest the basic nature of the product or service," it is not subject to protection at all. *Tana*, 611 F.3d at 774. Here, the mark is generic. It plainly stands for "One Time Only," a common phrase,[6] and clearly means a patient is only being admitted "One Time Only." If a mark is descriptive, or it "identif[ies] the characteristic or quality of a product or service," the mark "may become sufficiently distinctive to enjoy trademark protection by acquiring 'secondary meaning.'" *Id.* (quoting 15 U.S.C. § 1052(f)). Kipu alleges in conclusory fashion that the term "OTO "maintains secondary meaning to the relevant consumers of the Kipu EMR system." *See* Amended Complaint at ¶ 81 [DE 118]. But Kipu has not offered a shred of evidence to support the fact that the "relevant consumers" of all addiction treatment EMR systems associate the term "OTO" so closely with Kipu ZenCharts' use of "OTO" would constitute a false representation that ZenCharts' EMR System was produced by Kipu. In other words, Kipu cannot establish that during the relevant period (2015-2016), the term OTO was so associated with Kipu that ZenCharts' use of the term was the equivalent of telling consumers that Kipu was associated with ZenCharts' system. The idea strains credulity. Kipu alleges that it launched the EMR system in September 2012. *See* Amended Complaint at ¶ 7 [DE 118]. Kipu would have the Court believe that in under four years, the box "OTO" in its EMR system became so associated with Kipu that ZenCharts' program which contained the term "OTO" would be taken by any potential customers of EMR systems as a representation that Kipu made ZenCharts' program as well. Apparently, Kipu made this miraculous impact on the market without referencing "OTO" at all in any of its marketing materials. There were, and are, no customer testimonials about the Kipu product that reference "OTO." 30(b)(6) Deposition of

---

[6]     "OTO" is commonly known to stand for "One Time Only." In fact, the term "OTO" is referenced in the Urban Dictionary.
https://www.urbandictionary.com/define.php?term=OTO&utm_source=search-action
(last visited May 13, 2019)

Kipu, at p. 146, ll. 17-21. There is only a single pamphlet that Kipu developed referencing "OTO." 30(b)(6) Deposition of Kipu, at p. 146, ll. 22 – p. 147, ll. P. 148, ll. 7. And currently, there is no reference to "OTO" on Kipu's website. 30(b)(6) Deposition of Kipu, at p. 149, ll. 6-17. Kipu was asked point-blank to identify customers that were confused by the OTO designation, and could not name a single customer. *See* Kipu's Response to ZenCharts' First Interrogatories, at Response 11. For these reasons, Kipu cannot show that it had trademark rights in the unregistered term OTO when it was used by ZenCharts. Accordingly, the first element cannot be met.

### ii.    There Was No Likelihood of Confusion

Additionally, Kipu fails to meet its burden to show the second element because it cannot demonstrate any likelihood of confusion. The Eleventh Circuit applies the following seven-factor test to help evaluate confusion:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*See Tana*, 611 F. 3d at 774-75. Although all of the factors must be considered, the "likelihood-of-confusion multifactor test presupposes that various factors will point in opposing directions." *Id.* at 775 n.7. "The role of the court in reviewing a motion for summary judgment is to determine the ultimate question of whether, in light of the evidence as a whole, there is sufficient proof of a likelihood of confusion to warrant a trial of the issue." *Id.* "Although likelihood of confusion is a question of fact, it may be decided as a matter of law." *Id.* (holding that the district court properly entered summary judgment for defendant, despite multiple factors falling in the plaintiff's favor). All in all, in this case, there is insufficient proof of a "likelihood of confusion" to withstand summary judgment. Kipu argues that this common use "suggests to relevant and prospective customers seeking EMR software for addiction treatment centers that the ZenCharts System is affiliated, sponsored, endorsed, or related to Kipu and/or the Kipu EMR System, and its related rights to the trade name OTO, when it is not." Amended Complaint, ¶ 218 [DE 118]. Kipu alleges that as a result, ZenCharts' "improper and unauthorized use of the trade name OTO

is likely to cause, has caused, and will continue to cause, confusion among actual and/or potential customers of Kipu as to the origin, sponsorship or approval of the ZenCharts software." *Id.*, ¶ 220. No customer would review the components inside ZenCharts' EHR software, including the OTO Option, unless Zencharts was trying to sell it to that customer or had already sold it to the customer. That customer would have purchased the ZenCharts' system, would have created a username and password to enter the ZenCharts system, would see the name ZenCharts on every page of the system, and would know that Kipu had nothing to do with that system. And the customer—by definition—would be a sophisticated business offering addiction recovery treatment. Unsurprisingly, there is no evidence of actual customer confusion. Kipu is not aware of any customer that was confused by ZenCharts' brief use of OTO. 30(b)(6) Deposition of Kipu, at p. 146, ll. 13-16. Nor are there any market studies or other information demonstrating that there was actual or potential confusion in the marketplace. 30(b)(6) Deposition of Kipu, at p. 154, ll. 10 – 20. Under these circumstances, there is no potential for customer confusion.

      **d.**      **Kipu Was Not Damaged By The Use Of The OTO Mark**

Finally, as set forth below, there is no evidence of any actual damage that ZenCharts' fleeting use of the term "OTO" caused to Kipu. Kipu has not shown it lost goodwill with any customers as a result of the brief shared use of OTO, or that it lost any customers. There is no evidence of any customer that chose ZenCharts over Kipu as a result of ZenCharts' brief use of the term OTO:

> Q.     Kipu referred to some customer or -- are you aware of any customer who has chose[n] one product or the other based on OTO?
>
> A.     No.

30(b)(6) Deposition of Kipu p. 146, ll. 13-16. Kipu cannot identify a single customer it lost as a result of the OTO mark, or ZenCharts' use of the OTO mark. 30(b)(6) Deposition of Kipu, at p. 153, ll. 15 – 154, ll. 9. Kipu's claims fail on this basis as well.

### *Count VIII: Kipu's Trademark Counterfeiting Claim Fails*[7]

It is unclear which claims are being brought by Kipu under Count VIII. Kipu titles its count "trademark counterfeiting," but cites to 15 U.S.C. §§ 1114(1) and 1116(d)(1)(B). 15 U.S.C. § 1114(1) relates to infringement of a *registered* trademark. Section 1116(d)(1)(B) allows

---

[7]     Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

the Court to issue an ex parte preliminary injunction in certain circumstances. Neither section is applicable at this juncture.

Assuming Kipu is attempting to bring a trademark counterfeiting claim under 15 U.S.C. § 1117(b), Kipu must establish the elements of a trademark infringement claim and show intent. As set forth below, Kipu cannot establish a trademark infringement claim because (i) Kipu did not register its "OTO" trademark before ZenCharts stopped using the OTO label, and (ii) Kipu was not damaged by ZenCharts' fleeting use of that mark. Finally, Kipu has presented no evidence that ZenCharts intentionally used the trademark after it was issued.

### a. Kipu did not register its trademark until after ZenCharts' use stopped.

ZenCharts' EHR system did not violate Kipu's "OTO" trademark because ZenCharts removed the "OTO" function from its EMR system before Kipu registered the OTO mark with the USPTO. 15 U.S.C. § 1114(1)(a) prohibits use of "a registered mark" in connection with a sale "without consent of the registrant." "As is apparent from the plain language of the statute, § 1114 'governs suit for infringement of a *registered* trademark.'" *Pennell v. Triton Media, LLC*, A-12-CA-706-SS, 2013 WL 12131202, at *2 (W.D. Tex. Jan. 10, 2013) (emphasis in original) (quoting *Fuji Photo Film. Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 594 (5th Cir. 1985)). ZenCharts removed the term "OTO" from its EHR program on October 31, 2016. *See* DE 47-1, p. 23. Several months later, on January 24, 2017, the USPTO issued Kipu's trademark for the OTO mark. *See* Amended Complaint at ¶ 207. Clearly, the first element of a trademark counterfeiting claim is absent because Kipu did not register the trademark until **_after_** ZenCharts stopped using the term "OTO." Therefore, Kipu's trademark counterfeiting claim fails.

### b. Kipu Cannot Prove that Anyone Saw the Tutorial, Much Less That Kipu Was Damaged by That Alleged Use

Additionally, even if Kipu could establish all of the other elements of a claim under 15 U.S.C. § 1114(1), Kipu has not established causation or damages. In order to recover for trademark counterfeiting, the "plaintiff must demonstrate the basis for his recovery with specificity, thereby showing that injury or profitable infringement actually occurred." *St. Charles Mfg. Co. v. Mercer*, 737 F.2d 891, 893 (11th Cir. 1983) (citing *Vuitton Et Fils, S.A. v. Crown Handbags*, 492 F. Supp. 1071, 1077 (S.D.N.Y. 1979)). A "court cannot grant monetary relief unless there is evidence of actual damage [to the plaintiff] or actual profits [to the defendant] in dollars and cents." *Id.* (citing *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269 (3d Cir.

1975)). Additionally, a plaintiff is "required to establish that [a defendant's] alleged Lanham Act violations **proximately caused it to suffer monetary damages**." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (emphasis added). Where a plaintiff relies solely upon an expert witness, and the expert witness fails to tie the alleged acts to the specific damages claimed, judgment as a matter of law is appropriate because the plaintiff "introduced *no* evidence of the actual monetary damages that it suffered from [the defendant's] alleged trademark infringements and unfair competition on the company's website." *Id.* (emphasis in original).

Here, Kipu may claim that ZenCharts continued to use the "OTO" mark because the term "OTO" was referenced in a screenshot from a tutorial archived on ZenCharts' website. *See* DE 54, p. 10. On December 30, 2015 (while ZenCharts was using the term "OTO" in its system), ZenCharts created a tutorial for use by its customers titled "How to Properly Admit a Patient in ZenCharts." *See* April 30, 2018 Declaration of Glaser at ¶¶ 3-4. The sixteenth and final page of the tutorial showed a screenshot of ZenCharts' EHR system, complete with logo, that featured in small letters the term "OTO" at the bottom. *Id.* at ¶¶ 5-6 and ZenCharts 00151. The page in the tutorial containing the "OTO" term was not referenced in the tutorial, and was not part of the tutorial. *Id.* The help desk tutorial was removed from the internet once the existence of the "OTO" reference was disclosed in this litigation. *See id.* at ¶¶ 7-8.

ZenCharts' alleged use of the OTO trademark in the instructional section of its website is similar to the proverbial tree falling in the forest. There is no evidence that anyone (other than Kipu itself) ever saw the slideshow. There is no evidence that a Kipu customer or a potential Kipu customer saw the slideshow at all, the last page of the slideshow, or the small "OTO" notation at the bottom of that last page. To the contrary, the tutorial was an instructional series for ZenCharts' customers to understand how to set up a patient in ZenCharts. There was, and would be, no reason for anyone other than an already existing ZenCharts' customer to view the tutorial. Because only ZenCharts' customers would have reason to look at the tutorial, there is no evidence that a Kipu customer or potential Kipu customer saw the slideshow and was confused as to the relationship between Kipu and ZenCharts, or chose ZenCharts over Kipu. Finally, neither Kipu's damages expert nor Kipu itself has identified, or could identify, any damages that Kipu suffered as a result of ZenCharts' use of the "OTO." *See* Expert Report of Alan I. Blass, CPA, CFE, prepared February 4, 2019, attached as Exhibit Q to Defendants' Statement of

Undisputed Facts. Accordingly, damages are not recoverable, and any injunction would be moot as the slideshow has already been removed from the website.

### c.    ZenCharts Did Not Intentionally Use A Counterfeit Mark

Finally, Kipu cannot establish that ZenCharts' use of the OTO mark was intentional, as required for its trademark counterfeiting claim. "[I]n order for [Kipu] to prevail on its counterfeiting claim, it must demonstrate that [ZenCharts] infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), and it must prove that [ZenCharts] 'intentionally used a mark, knowing such mark is a counterfeit mark.'" *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (quoting 15 U.S.C. § 1117(b)); *see also Pennzoil-Quaker State Co. v. Smith*, No. 2:05CV1505, 2008 WL 4107159, at *20 (W.D. Pa. Sept. 2, 2008) ("the only material difference between the standard for federal trademark infringement and trademark counterfeiting is the requirement of proving defendant intentionally used the plaintiff's trademark, knowing it was a counterfeit, which, if proven, entitles the plaintiff to an award of treble and/or statutory damages.") (citing *Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.*, No. CIV. A. 96-cv-6961, 1998 WL 288423, at *3 (E.D. Pa. Jun. 3, 1998)); *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536–37 (D. N.J. 2008) ("The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit."). Kipu cannot show the element of intentional use of a registered trademark. To the contrary, the undisputed proof is that ZenCharts removed the "OTO" designation from its product in order to avoid any similarities to the Kipu product, and did so long before that mark was ever registered. On October 28, 2016, Richard Glaser, Chief Executive Officer of ZenCharts, instructed technical support to remove the "OTO Option" from the EHR System. *See* Deposition of Glaser at p. 80, ll. 11-17; *see also* October 28, 2016 Glaser Email, Exhibit L. This was documented by a contemporaneous communication, which has been produced to Kipu. *See* DE 47-1, p. 23. Kipu's only purported evidence of ZenCharts' use of the term "OTO" after the trademark was registered is a screenshot from the last page of an outdated instruction slideshow archived on its website. *See* DE 54, p. 10. These materials were accidently left on an archived portion of the website, and did not even discuss or refer to the "OTO" feature. S*ee* March 23, 2018 Declaration of Glaser at ¶ 6-8. Kipu offers no motive for ZenCharts' use of the outdated mark, which was no longer even

included in its EMR system. Without any circumstantial evidence (and no direct evidence) to overcome ZenCharts' documented intent to stop using the term OTO before the trademark was registered, there is no evidence of intent to submit a trademark counterfeiting case to the jury. Accordingly, this Court should grant summary judgment on Kipu's trademark counterfeiting claim.

### *Count IV: Kipu Failed To Allege Any Actionable Theft of Trade Secrets*[8]

Count IV of Kipu's Amended Complaint alleges that Defendants misappropriated Kipu's trade secrets. According to the Amended Complaint, those trade secrets included "the OTO program, OTO algorithm, Kipu EMR System Workflows, and Kipu architecture." Amended Complaint at ¶ 157 [DE 118]. While Kipu has avoided every request to identify with reasonable particularity what those trade secrets are, it is crystal clear what they are not. Kipu has no evidence that Defendants misappropriated, stole, or copied Kipu's source code. There is no direct evidence that any Defendant accessed any of Kipu's source code. 30(b)(6) Deposition of Kipu, at p. 94, ll. 4-10. There is no evidence that any portion of source code in the ZenCharts system was copied from Kipu's source code. Kipu's experts have compared the source code of the two systems, and have not found that any of the source code from the Kipu system was copied into the ZenCharts system. Instead, the sum total of the alleged trade secrets that Kipu claims were misappropriated were located on Kipu's public-facing user interface. However, by their nature, those features and functions on Kipu's user interface are not, and cannot be, trade secrets. Kipu's workflows are generally described on the Kipu website, including the Kipu EMR Tour. 30(b)(6) Deposition of Kipu, at p. 156, ll. 6-16; Depo. Ex. 197. The Kipu EMR Tour on the Kipu website describes the features and functionalities of the Kipu system, includes screenshots of the Kipu user interface, and takes the user through the entire Kipu workflow. 30(b)(6) Deposition of Kipu, at p. 156, ll. 17 – p. 157 ll. 19; Depo. Ex. 197. Likewise, screenshots of the Kipu user interface are located Kipu's website, and are available for the general public to see. 30(b)(6) Deposition of Kipu, at p. 157, ll. 25 – 159, ll. 4; Depo. Ex. 198. Kipu has videos on the internet that also contain screenshots of Kipu's user interface. 30(b)(6) Deposition of Kipu, at p. 161, ll. 9 – 18; Deposition of Cliff Levine, at p. 152 ll. 6 – 154 ll. 1; Depo Ex. 199, 200, 201. Kipu's user interface is also disclosed to potential customers during demonstrations. Deposition of Cliff

---

[8] Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

Levine, at p. 154 ll. 16- p. 155 ll. 2. Kipu has performed thousands of demonstrations to potential customers and to vendors who serve those customers. 30(b)(6) Deposition of Kipu, at p. 161, ll. 19-24; p. 164 ll. 3-8. Kipu also discloses its user interface to the general public at trade shows, and will show the potential customer the parts of the Kipu user interface that the potential customer wants to see. Deposition of Cliff Levine, at p. 156, ll. 18 – p. 159, ll. 5.

Kipu's trade secrets claim fails for two reasons. First, Kipu fails to identify with reasonable particularity what those trade secrets were. Second, Kipu's attempt to claim that the "look and feel" and "features and functions" of the user interface of its EMR system are trades secret fails because those characteristics of the Kipu system were, and are, publicly available and Kipu has failed to adequately protect them from public disclosure.

### a.     Kipu Fails to Identify Any Alleged Trade Secret with Particularity

Kipu fails to identify any specific trade secrets that were taken. In order to assert a claim for theft of trade secrets, a plaintiff must "allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret." *Dyncorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016); *see also Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1252–53 (M.D. Fla. 2002) (entering summary judgment for defendant where "Plaintiff has failed to allege or provide evidence as to what trade secret that Defendants allegedly misappropriated."). And "[a] plaintiff has the burden to describe the alleged trade secret with reasonable particularity." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010) (citing *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007)). "[B]road and generic categories of information . . . provide insufficient notice as to the actual trade secrets misappropriated." *Am. Registry, LLC v. Hanaw, No. 2:13-CV-352-FTM-29*, 2013 WL 6332971, at *4 (M.D. Fla. Dec. 5, 2013). For example, in *Hanaw*, the plaintiff alleged that the defendant had misappropriated its trade secrets, which included:

> [C]ustomer lists, customer identity, customer contact information and confidential information about each customer's business, purchase and credit information, sales and operation procedures, software, system architecture, financial data, sales and marketing strategies and data, lists, statistics, programs, research, development, employee, personnel and contractor data, information and records, and information relating to products offered by AMERICAN REGISTRY.

*Id.* at *3 (emphasis added). The court held that this list of alleged trade secrets was "so broad as to be meaningless." *Id.* at *4. "Plaintiff need not disclose secret information in its pleadings, but must identify it with enough specificity as to give defendants notice of what was misappropriated." *Id.*; *see also Taxinet, Corp. v. Leon*, Case No. 16-24266-CIV, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018) (concluding that allegation of theft of "broad categories" of trade secrets including "confidential business information, processes, techniques, software applications, and business characteristics" did not adequately allege describe trade secrets).

As was true in *Hanaw* and *Taxinet*,[9] Kipu only identifies broad categories of information that it claims Defendants have misappropriated. For example, in its Amended Complaint, rather than identifying the specific trade secrets it claims Defendants took, it merely says that its "trade secrets [are] found in the underlying computer architecture as well as independently the overall design of the Kipu EMR System." *See* Doc. 118, ¶ 10. Like the plaintiffs in *Hanaw*, Kipu says that these alleged trade secrets "are in the form of financial, business and economic information, including designs, methods, techniques, processes, and procedures which are writings stored or memorialized electronically (as well as in print form)." *Id.* at ¶ 66. In the only attempt at a substantive explanation of the actual trade secrets, Kipu alleges that those trade secrets "include the Kipu EMR System workflows, the overall Kipu EMR System architecture, as well as related design of the system." *Id.* at ¶ 72. But, as the court found in *Hanaw*, Kipu's identification of trade secrets that Defendants allegedly misappropriated is "so broad as to be meaningless."

---

[9]     While *Hanaw* and *Taxinet* involved claims under Florida's Uniform Trade Secrets Act, the relevant provisions of that act are practically identical to the relevant provisions of the Defend Trade Secrets Act. Compare Fla. Stat. § 688.002(4) ("'Trade secret' means information . . . [that] [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.") with 18 U.S.C. § 1839(3) ("[T]he term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . if--(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.").

*Hanaw*, 2013 WL 6332971, at *4. Kipu does not say what the "architecture" and "workflows" are in order for the Court to determine whether those could even be trade secrets.

> **b.     Kipu's "Look and Feel," "Features and Functions," and Other Parts of the User Interface Are Not Trade Secrets**.

Kipu's broadly described traits are not valid "trade secrets" under the Federal Defend Trade Secrets Act ("DTSA"). According to Eleventh Circuit law, Kipu cannot claim the "look and feel" "features and functions" or other parts other the user interface of its EMR is a protectable trade secret because it was available to its customers and, in Kipu's case, to the world. This case is strikingly similar to *Warehouse Solutions, Inc. v. Integrated Logistics, LLC*, 610 F. App'x 881 (11th Cir. 2015). In *Warehouse Solutions*, a plaintiff claimed its customer stole the look and feel of its product and became a competitor. *Id.* at 883. The plaintiff repeatedly told its customer that its software "was highly confidential and proprietary," and the customer never had access to the source code. *Id.* The plaintiff sued its customer-turned-competitor for theft of trade secrets, and the Eleventh Circuit entered summary judgment in favor of the competitor. *Id.* The court noted that "the functionality of the program itself" or "how [it] looked and worked was readily apparent to authorized users with an ID and password." *Id.* at 885. In other words, the "dissemination of [the software] to users necessarily revealed the information [plaintiff] alleges to be secret (i.e., the program's 'features and functions')," thus the plaintiff's "efforts to maintain secrecy were not reasonable under the circumstances." *Id.* Kipu was not secretive regarding the "look and feel" and "features and functions" of its product, and readily admits that it will show its product without a non-disclosure agreement or other similar protection. *See* Deposition of Levine p. 157, ll. 15-17 ("No, we don't ask for a NDA"). Kipu has done product demonstrations at trade shows. *See* Deposition of Joseph Henderson, Kipu salesperson, at p. 16, ll. 19-21. Kipu would begin presentations by logging into its "demo site," and would walk prospective customers through all of the portions of its program. *Id.* at p. 20, ll. 11-16 and p. 22, ll. 9-22. Kipu wanted, as best as it is capable, to have customers know exactly how to use its product before purchase. *Id.* at p. 23, ll. 8-16. In that regard, Kipu would occasionally have two, three or four product demonstrations for a potential client, but the client would end up not signing up with Kipu. *Id.* at p. 26, ll. 12-22. Kipu does not require prospective customers to sign non-disclosure agreements, even with multiple demonstrations of the EMR system. *See id.* at p. 27, ll. 1-9. Kipu does not require any nondisclosure agreement until a potential customer has unfettered

access to the program. *Id.* at p. 29, ll. 15-23. Even if the "look and feel" or "features and functions" of Kipu's EMR could be considered a trade secret, Kipu did nothing to protect this aspect of its EMR.

In addition to providing an unlimited amount of demonstrations to a potential client, Kipu houses several images of its user interface and system capabilities on its website. *See* Deposition of Levine p. 150, ll 17-22 ("There are screenshots of the user interface, yes."). Kipu's workflows, for example, are described on the Kipu website, including a series of webpages called the Kipu EMR Tour. 30(b)(6) Deposition of Kipu, at p. 156, ll. 6-16; Depo. Ex. 197. The Kipu EMR Tour on the Kipu website describes the features and functionalities of the Kipu system, includes screenshots of the Kipu user interface, and takes the user through the entire Kipu workflow. 30(b)(6) Deposition of Kipu, at p. 156, ll. 17 – p. 157 ll. 19; Depo. Ex. 197. That Kipu workflow is the same workflow that Kipu now contends is a trade secret. Moreover, Kipu's website currently has more than 100 pages screenshots, features and functions from the user interface. *See* Kipu Screenshots, Exhibit H. Not only does Kipu provide examples of their user interface in product demonstrations and on their website, but Kipu hosts a YouTube channel where it walks any viewer through how to work different instances of their system. *See* Deposition of Levine p. 152, ll. 9 – p. 153, ll. 22; *see also* YouTube Screenshots, Exhibit H.

For all of these reasons, Kipu's trade secrets claim must fail.

### *Count V: No Conspiracy Is Alleged or Proven, and No Underlying Tort Is Established*[10]

#### a. **Kipu's Conspiracy Claim Depends Upon The Trade Secret Claim**

Kipu's claim for conspiracy to commit trade secret theft fails along with its claim for trade secrets in Count IV. "An actionable conspiracy requires an actionable underlying tort or wrong." *Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984). Under Florida law, a plaintiff must show "that 1) two or more parties 2) agree 3) to commit an unlawful act" to be successful in a conspiracy claim. *Amer. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007). "[T]he "gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff." *Id.* "Thus, as [the Eleventh Circuit] has noted, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim." *Id.* Here, Plaintiff's conspiracy count relies on a purported agreement to

---

[10] Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

steal trade secrets. *See* Amended Complaint at ¶ 169. As set forth above, Count VI for theft of trade secrets fails. Therefore, Defendants are entitled to summary judgment on Kipu's conspiracy claim.

    **b.**    **Kipu cannot Show Any Necessary to Prevail on its Conspiracy Claim**

Further, Kipu has failed to demonstrate that there was an actual agreement by the Defendants to steal a "trade secret." *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1243–44 (M.D. Fla. 2017), *aff'd*, 898 F.3d 1279 (11th Cir. 2018) ("Because [plaintiff] fails to identify a trade secret that the defendants allegedly conspired to misappropriate, the conspiracy claim fails."); *Morrison v. Univ. of Miami*, 1:15-CV-23856-UU, 2016 WL 3128604, at *9 (S.D. Fla. Mar. 21, 2016) (dismissing with prejudice "civil conspiracy claim [that] contains barebones and conclusory allegations."). "Some proof of knowledge of a conspiracy, and participation in it by the alleged tortfeasor, must be shown in order to survive a motion for summary judgment." *Menendez v. Beech Acceptance Corp.*, 521 So. 2d 178, 180 (Fla. 3d DCA 1988). There is no direct evidence of an agreement, and while Kipu argues there are suspicious circumstances surrounding the Defendants' activities, suspicion does not rise to the level of proof. *See Bivens Gardens Office Bldg. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir. 1998) ("Although the plaintiffs presented circumstantial evidence showing that something suspicious was going on . . . that showing of "suspiciousness" was not enough to save their conspiracy claims."). As Kipu does not allege or prove any agreement to steal any trade secret, summary judgment is proper as to Kipu's conspiracy claim.

    **c.**    **The Intracorporate Conspiracy Doctrine Bars Kipu's Claims**

Additionally, although it is unclear due to the ambiguous allegations of the Amended Complaint, Kipu's conspiracy claim is also  barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine "provides that 'neither an agent nor an employee can conspire with his or her corporate principal or employer.'" *Mancinelli v. Davis*, 217 So. 3d 1034, 1036 (Fla. 4th DCA 2017) (quoting *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d 963, 966 (Fla. 4th DCA 2002)). Furthermore, "a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation." *Dickerson v. Alachua Cty. Com'n*, 200 F.3d 761, 767 (11th Cir. 2000). Here, Kipu sues "all of the Defendants in their individual capacities," ZenCharts, Solutions, and Website Solutions (entities). *See* Amended Complaint at Count V. Kipu alleges that six separate individual

defendants conspired with four separate entities, and all of the individuals are alleged to be agents of at least some of the entities. *See id.* For example, Kipu claims that all of the individual Defendants moving for summary judgment (Glaser, Sean Callahan, Dan Callahan, and Karkalichev) are also owners, officers and/or employees of the various corporate entities, including Solutions, Website Consultants, and ZenCharts. *See* Amended Complaint at ¶¶ 102, 109-111, 114 [DE 118]. Kipu cannot state a conspiracy claim against these individuals for "conspiring" between themselves and with their allegedly affiliated entity. Accordingly, Kipu's conspiracy claim is barred by the intracorporate conspiracy doctrine.

### *Count VI: No Conversion Claims Are Pled, and Any Such Claims Are Preempted*[11]

#### a.   **Kipu Fails to Identify or Prove An Actionable Conversion**

Kipu does not adequately allege or prove any property that it owned that was taken by Defendants so as to sustain a conversion claim. "Under Florida law, the elements of conversion are '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.'" *Joe Hand Promotions, Inc. v. Sorota*, 11-80985-CIV, 2012 WL 2414035, at *2 (S.D. Fla. June 26, 2012) (quoting *Spec. Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1099-1100 (S.D. Fla. 2000)). "The essence of the tort of conversion is a party's refusal to surrender the property after a demand has been made." *Imagine Commc'ns Corp. v. Villegas*, No. 17-cv-20401-GAYLES/OTAZO-REYES, 2017 WL 2304013, at *6 (S.D. Fla. May 19, 2017), unless such a demand would be futile. Kipu cannot demonstrate *what* exactly Defendants allegedly took, which is fatal to its case. *See Taxinet, Corp. v. Leon*, 16-24266-CIV, 2018 WL 3405243, at *5 (S.D. Fla. July 12, 2018) (dismissing "conversion count [that] does not sufficiently allege the confidential business information that Defendant purportedly took."). "It is axiomatic that a party may not assert a cause of action for misappropriation of trade secrets without identifying for the opposing party the trade secrets at issue." *Selectica, Inc. v. Novatus, Inc.*, 6:13–cv–1708-ORL-40TBS, 2015 WL 12852957, at *5 (M.D. Fla. Mar. 26, 2015) (quoting *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. Nov. 20, 2008)). Here, Kipu alleges theft of certain of "Kipu's trade secrets and other proprietary and confidential elements of the KIPU EMR System." *See* Amended Complaint at ¶ 178. These purportedly "proprietary and confidential

---

[11]       Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

elements" are not identified. *See id.* at ¶¶ 178-185. Kipu does not allege sufficient facts to establish conversion of its property. *See id.* And Kipu has not presented any evidence that any "proprietary and confidential elements" of its EMR system were taken. Accordingly, Kipu's conversion claim fails.

      **b.**    **Kipu's Claims for Conversion Are Preempted**

     Additionally, Kipu's claims for conversion of proprietary information are preempted. "Section 688.008 of FUTSA 'displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.'" *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279 (S.D. Fla. 2018) (quoting Fla. Stat. § 688.008(1)). Where all of the "allegations of the Complaint [] are based on the 'conversion' or 'tak[ing]' of the same trade secrets and proprietary information as the misappropriation of trade secrets claims," the "Florida common law conversion of confidential information and proprietary information (Count VIII), and Florida common law unfair competition" are preempted by FUTSA. *Id.* Courts in the Southern District of Florida have joined "the majority position that 'the FUTSA preempts all non-contract claims based on the misappropriation of confidential and/or commercially valuable information even if the information does not constitute a trade secret under the FUTSA.'" *Jouria v. CE Res., Inc.*, No. 0:15-CV-61165-WPD, 2017 WL 3868422, at *5 (S.D. Fla. July 17, 2017) (citing *Hanaw*, 2014 WL 12606501, at *6; *see also Kika M2M LLC v. Pittman*, No. 17-60283-CIV, 2017 WL 7732872, at *6 (S.D. Fla. Sept. 5, 2017) ("the Court need not determine that a trade secret exists to find preemption."); *Vape Fiends, Inc. v. Lightfire Group, LLC*, No. 17-60951-CIV, 2017 WL 5953429, at *3 (S.D. Fla. Aug. 21, 2017) (holding that common law claim "based on the misappropriation of information, whether or not the information meets the definition of a trade secret . . . is preempted or displaced by the FUTSA"); *Boston Sci. Corp. v. Ruiz*, No. 05-21270-CIV, 2005 WL 8155080, at *5 (S.D. Fla. July 20, 2005) (finding preemption "despite pertaining in nomenclature to 'confidential information' rather than 'trade secrets.'"). Kipu's Conversion claim (Count VI) expressly alleges "unauthorized conversion of Kipu's trade secrets" and "those elements which may not necessarily rise to the level of a trade secret" under federal law. *Id.* As noted above, whether the purported confidential information qualified as a trade secret or not, Kipu's claim for conversion is preempted by Florida Statute § 688.008.

### Count VII: Kipu's Common Law Trespass to Chattels Claim Fails Under Florida law[12]

Kipu's trespass to chattels claim fails under established Florida law, which does not allow claims for trespass to electronic property. "Trespass to personal property is the intentional use of, or interference with, a chattel which is in the possession of another, without justification." *Dish Network, LLC v. Fraifer*, No. 8:16-cv-2549-T-17TBM, 2017 WL 3701141, at *2 (M.D. Fla. July 21, 2017) (quoting *Burshan v. Nat'l. Union Fire Ins. Co. of Pittsburgh, Pa.*, 805 So. 2d 835, 845 (Fla. 4th DCA 2001)). "The word 'chattels' is defined as: [e]very species of property, movable or immovable, which is less than a freehold." *Id.* (quoting *Burshan*, 805 So. 2d at 845 (Fla. 4th DCA 2001)). Florida law does not include intangible property in this definition. *See id.* (finding Defendants failed to prove that URL links allegedly stolen by Plaintiffs are subject to a trespass to chattels claim); *see also Bain v. Jocket Club Tech. Servs., Inc.*, No. 07-80371-CIV-HURLEY/HOPKINS, 2007 WL 9706994, at *4 (S.D. Fla. Oct. 2, 2007) ("Florida law does not recognize an action for trespass to chattels in cases where the plaintiff has alleged unauthorized access to a database or website.") (quoting *Inventory Locator Serv., LLC v. Partsbase, Inc.*, No. 02-2695 MA/V, 2005 WL 2179185 at *11 (W.D. Tenn. 2005)); *Burshan*, 805 So. 2d at 846 (concluding that a bank account is not a "chattel."). Here, Kipu alleges that the named defendants "trespassed upon the Kipu's property, namely its Kipu EMR System." *See* Amended Complaint at ¶ 188. Given the foregoing authority, it is clear that Defendants' purported access to Kipu's EMR system is not an actionable trespass under Florida law.

### Count XII: Florida Deceptive and Unfair Trade Practices Act[13]

#### a.    Kipu Cannot Show Injury to Customers As Required

First, Kipu's FDUTPA claim fails because it cannot show injury or detriment to customers. Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1). In order to establish a FDUTPA claim, "a plaintiff must still prove 'an injury or detriment to consumers.'" *ADT LLC v. Vivint, Inc.*, No. 17-CV-80432, 2017 WL 5640725, at *5 (S.D. Fla. Aug. 3, 2017) (quoting *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015)). In

---

[12]    Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

[13]    Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

*Caribbean Cruise Line, Inc.,* the court noted that while a plaintiff need not be a consumer, the plaintiff "would have to prove that there was an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim." *Caribbean Cruise Line, Inc.*, 169 So. 3d at 169. A complaint fails when the plaintiff fails to sufficiently allege damage to customers. *See CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *16 (M.D. Fla. Feb. 15, 2018). "Importantly, an act is not deceptive and a practice is not unfair unless a consumer was actually aggrieved by the act or practice." *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017) (dismissing case where "by its own allegations, [plaintiff] fails to show that a consumer has actually been aggrieved by [defendant's] conduct.") (citing *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000)). Here, Kipu alleges that "[t]he Defendants have engaged in a carefully orchestrated plot of unauthorized access to the Kipu System under false pretenses, resulting in the misappropriation and theft of Kipu's intellectual property." Amended Complaint at ¶ 235. Kipu also alleges that "[t]he Defendants knew, or should have known that their acts and practices of hijacking the Kipu System and replication of the OTO Mark within the ZenCharts System were both unfair and deceptive actions." *Id.* at ¶ 239. In other words, Kipu claims that ZenCharts' purported actions were damaging to Kipu. But Kipu utterly fails to prove that a single consumer was damaged as a result of any of ZenCharts' alleged actions. Nor could a consumer be damaged. Kipu's entire theory is that ZenCharts allegedly stole its EMR system and created a cheaper competing product. There is simply no way to twist this theory to create a scenario where any consumers were damaged.

### b.    Kipu Has Not Suffered Any Actual Damages Under FDUPTA

Second, Kipu's FDUPTA claims fail because Kipu does not allege any actual damages. "To state a FDUTPA claim, plaintiff must allege: (1) a deceptive act or unfair trade practice; (2) causation; and (3) **actual damages**." *Marjam Supply Co. of Fla., LLC v. Pliteq, Inc.*, No. 15-24363-CIV, 2018 WL 4932871, at *4 (S.D. Fla. Apr. 23, 2018) (Williams, J.) (emphasis added) (citing *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243 (11th Cir. 2013)). And "[w]hen a plaintiff fails in [its] complaint to allege a recoverable loss under FDUTPA, the complaint fails to state a cause of action under FDUTPA." *Hobirn, Inc. v. Aerotek, Inc.*, No. 10-61144-CIV, 2012 WL 13005347, at *9 (S.D. Fla. July 25, 2012) (citing *Rodriguez v. Recovery Performance & Marine, LLC,* 38 So. 3d 178, 180 (Fla. 3d DCA 2010)). "'Actual damages'" for purposes of

FDUTPA have been defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Id.* (quoting *Rodriguez,* 38 So. 3d at 180). "The statute very clearly states that it does not apply to 'a claim for damage to property other than the property that is the subject of the consumer transaction.'" *Id.* (quoting Fla. Stat. § 501.212(3)). Kipu does not allege that its property was damaged by any actions of ZenCharts. Kipu does not allege to have suffered any "actual damages," as that term is defined under this statute, as a result of ZenCharts' purported actions. As Kipu fails to allege a recoverable loss, Defendants are entitled to summary judgment on Kipu's FDUPTA claim.

c.      **Kipu's Lost Profits Are Not Recoverable**

Third, Kipu's entire damage model consists solely of lost profits, which are not "actual damages" and are not recoverable under FDUPTA. *See* February 4, 2019 Expert Report of Alan Blass, filed as Exhibit Q, at p. 3 (Kipu's "combined lost profits for the 10-year period [from] January 1, 2015 to December 31, 2024 is calculated at $28,705,200."). "Florida courts 'specifically reject the recovery of consequential damages under FDUPTA.'" *Marjam Supply Co. of Fla., LLC*, 2018 WL 4932871, at *4 (quoting *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999)). "Lost profits are a form of consequential damages," and are thus not recoverable under a FDUPTA claim. *B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, No. 16-62364-CIV, 2017 WL 8751747, at *4 (S.D. Fla. Nov. 14, 2017), *aff'd,* No. 17-15793, 2018 WL 6719403 (11th Cir. Dec. 19, 2018) (citing *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987)). In *B & D Nutritional Ingredients*, a business sued under FDUPTA after a competitor allegedly stole their customer list and pilfered those customers. *Id.* The trial court found that "[t]he only resulting damages [the business] can allege are lost profits from the evaporation of its business with those customers," but since "lost profits fall outside of FDUTPA's ambit," the competitor was entitled to summary judgment. *Id.* The trial court alternatively found that "the record evidence demonstrates that [the business] has not in fact lost any of its customers." *Id.* On appeal, the business admitted that "*future* lost profits are unavailable under the FDUTPA, but it argue[d] that the court erred by treating *all* lost profits as unavailable." *Id.* (emphasis in original). The Eleventh Circuit affirmed, and noted that "even if past lost profits were available under the statute, [the plaintiff] had no evidence of past lost profits." *Id.* Similarly, in *ADT LLC v. Vivint,*

45

*Inc.*, No. 17-CV-80432, 2017 WL 5640725, at *5 (S.D. Fla. Aug. 3, 2017), a hardware and service provider sued a competitor for allegedly misleading its customers in a number of ways, including by claiming that the competitor was affiliated. Citing the foregoing principles, the court noted that the provider "failed to allege a difference in the market value of a product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Id.* The court rejected the provider's argument that "lost future monthly payments for services" is different than lost profits, and found that both are consequential damages not recoverable under FDUPTA. *Id.* The court dismissed the damages claim, and allowed the injunctive relief claim to proceed. *Id. B&D Nutritional Ingredients* and *ADT* are controlling here. Kipu brings FDUPTA claims based upon Defendants' purported theft of aspects of its EMR system. Kipu then seeks to hold ZenCharts liable for its lost profits. However, Kipu's purported lost profits are not recoverable under FDUPTA. Accordingly, Defendants are entitled to on Kipu's FDUPTA claim.

### d.      Kipu's FDUPTA Claim Fails Along With Its Other Claims

Fourth, Kipu's FDUPTA claim fails because it is based upon Kipu's claims under state and federal statutes, which also fail. *See SGI, Inc. v. IBM Glob. Fin.*, No. 11-80880-CIV, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) ("Plaintiffs based all FDUTPA allegations on violations of state and federal statutes that the court had already considered and rejected, thus there could be no FDUTPA violation."). Kipu alleges that Defendants' "acts and practices" violate "the intent and meaning of the Federal Trade Commission Act" and "the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission and federal courts." *See* Amneded Complaint at ¶ 237. Kipu does not allege which Defendants committed which acts, or which provisions of the Federal Trade Commission Act were purportedly violated. Kipu has failed to allege any statutory violations, and has thus failed to allege an actionable FDUPTA claim.

### *Count XIII: Tortious Interference with Business Relationships*[14]

### a.      Kipu Has Not Alleged Lost Business Opportunities

Kipu's tortious interference with business relationship claim fails because Kipu has not shown any actual lost business opportunities, and simply rests on broad allegations of

---

[14]      Kipu filed a Motion to Amend seeking to voluntarily dismiss this claim. *See* DE 156.

opportunities with potential customers generally. "The elements of a cause of action based on tortious interference with a business relationship are: (1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship." *Cent. States, Se. & Sw.v. Fla. Soc. of Pathologists*, 824 So. 2d 935, 940 (Fla. 5th DCA 2002) (citing *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500 (Fla. 5th DCA 2001)). An enforceable contract is not required, but "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Id.* "As a general rule, an action for tortious interference with a business relationship requires a business relationship shown by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* A plaintiff's "relationship with the public at large [i]s not the type of business relationship required to allege tortious interference with a business relationship"; instead, a plaintiff must "allege and prove a business relationship with an identifiable person." *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996). Here, Kipu merely alleges that ZenCharts generally tried to take its customers and market itself as a similar product. But Kipu is unable to allege any specific relationship with a customer with whom Kipu had existing or prospective rights with which ZenCharts interfered. In particular, Kipu knows, and can determine, how many customers it lost to ZenCharts. 30(b)(6) Deposition of Kipu, at p. 184, ll. 17-25; p. 186, ll. 17-24; p. 188, ll. 1-5. *See also* 30(b)(6) Deposition of Cliff Levine, at p. 187 ll. 14 - 188 ll. 25. Yet, Kipu fails to identify any of those lost customers, or allege any tortious interference with any of them. Kipu's claim is insufficient and fails as a matter of law.

### b. ZenCharts' Alleged Conduct Is Not Actionable

Further, even if Kipu were to identify some existing customer, it cannot show that ZenCharts intentionally interfered by soliciting the customer. "[U]nder Florida law, '[o]ne does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.'" *Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. Appx. 913, 915 (11th Cir. 2016) (footnote omitted) (quoting *Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So. 2d 1105, 1107 (Fla. 4th DCA 2000)). Indeed, a seller of a product can contact a competitor's customer and offer to sell the product at a lower price; this is not actionable

fraudulent inducement. *Martin Petroleum Corp.*, 769 So. 2d at 1108. Despite this law, Kipu attempts to sue ZenCharts for pitching the ZenCharts EHR system "to Kipu's customers and users at prices that significantly undercut Kipu." *See* Amended Complaint at ¶ 244.  Kipu cannot maintain a tortious interference claim against ZenCharts for simply selling a better product at a cheaper price – all of which ZenCharts is allowed to do by Florida law. Accordingly, Defendants are entitled to summary judgment on Kipu's tortious interference claim.

> **c.** **ZenCharts is Protected by the Competitor's Privilege**

Lastly, ZenCharts' actions are protected under the competitor's privilege. "Florida law recognizes the right of competitors to compete for customers." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1158 (11th Cir. 2001) (citing *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980)). To establish the privilege, a defendant must show that "the [customer] relationship concerned a matter involved in the competition between [plaintiff and defendant]; (2) [defendant] did not employ improper means; (3) [defendant] did not intend to create or continue an illegal restraint of competition; and (4) [defendant's] purpose was at least in part to advance its interest in competing with [Plaintiff]." *Id.* at 1159. Here, Kipu's tortious interference claim is barred by the competitor's privilege, because it is undisputed that ZenCharts and Kipu were in competition, ZenCharts' purpose was to advance its own interests in competition, and Kipu cannot show any evidence that ZenCharts used "improper means" in its competition with Kipu.

**Damages: Kipu's Claims For Damages Fail**

Kipu's damages claims fail for two reasons. First, Kipu does not have reliable evidence for or a legally supportable damage model. Second, for Kipu's Breach of Contract claims based on the 2013 Terms of Service (Count XIV) and the 2014 Terms of Service (Count III), Kipu's own Terms of Service prohibit recovery of lost profits and consequential damages – the only damages Kipu seeks in this case.

> **a.** **Kipu's Damages Claims on All Counts Fail for Lack of Reliable and Legally Supportable Damage Theory.**

The Court should enter summary judgment excluding Kipu's claims for damages because Kipu does not have any admissible damage expert or damage model. Where a plaintiff's "expert opinions are inadmissible, [and the plaintiff] has no other evidence of damages, [the defendant] is entitled to summary judgment on damages and under every count." *In re Sherwood Invs.*

*Overseas Ltd., Inc.*, No. 6:10-AP-00158-KSJ, 2015 WL 4486470, at *33 (Bankr. M.D. Fla. July 22, 2015), *aff'd*, No. 615CV1469ORL40TBS, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016). Here, Kipu's damage model consists solely of lost profits, and Kipu has relied solely and exclusively upon the expert testimony of Alan Blass to calculate those lost profits. *See* February 4, 2019 Expert Report of Alan I. Blass, Exhibit Q, at p. 3. Specifically, Kipu's purported expert seeks to testify that Kipu has (or will have) $28,705,200 in "lost profits" during the period from January 1, 2015 to December 31, 2024. However, as set forth in Defendants' motion to exclude Kipu's expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Kipu's expert's testimony is fundamentally flawed because (i) it is not supportable by any accepted theory of calculating lost profits, and (ii) it makes assumptions and conclusions that are not reliable. For example, Kipu's claims might entitle it to recover either Kipu's own lost profits or disgorgement of ZenCharts' profits. "The remedy of damages seeks to compensate the victim for its loss, whereas the remedy of an accounting . . . [seeks] disgorgement of ill-gotten profits." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods. , LLC*, 137 S. Ct. 954, 964 (2017) (citing *Birdsall v. Coolidge*, 93 U.S. 64, 68–69 (1876)). "In cases of wrongful enrichment, a plaintiff whose goods or services were obtained by a conscious wrongdoer generally has two available remedies: compensatory damages or restitution." *Guyana Tel. & Tel. Co., Ltd. v. Melbourne Intern. Commc'ns, Ltd.*, 329 F.3d 1241, 1249 (11th Cir. 2003). The former would involve a calculation of customers Kipu lost and how much Kipu lost from those customers. The latter would take the customers ZenCharts acquired and calculate the profits ZenCharts generated from those customers. Kipu's damage theory seeks neither. Rather, Mr. Blass opines that Kipu is entitled to Kipu's lost profits on ZenCharts' customers. *See* Blass Report, Exhibit Q, at p. 3. Kipu does not have any other evidence of damages. When the Court strikes Kipu's expert, the Court should enter an order awarding summary judgment in Defendants' favor on Kipu's claims for damages.

      **b.**      **Kipu Waived Consequential Damages and Lost Profits under 2013 Terms of Service and 2014 Terms of Service**

As noted above, Defendants maintain that the 2013 Terms of Service and 2014 Terms of Service do not apply. But even if the Terms of Service are somehow found to apply, Kipu waived the damages sought in this lawsuit. Contractual provisions limiting liability "for prospective profits or special, indirect, or consequential damages" are generally enforceable

under Florida law. *See Golden v. Mobil Oil Corp.*, 882 F.2d 490, 492 (11th Cir. 1989). Both

Kipu's 2013 and 2014 Terms of Service state:

> You expressly understand and agree that, except for our respective obligations under the paragraph titled "Mutual Indemnifications" above, **neither party** shall be liable for any **indirect, incidental, special, punitive, consequential or exemplary damages, including**, without limitation, **damages for loss of profits, goodwill, use, data or other intangible losses** (even if we have been advised of the possibility of such damages), **resulting from: (i) the use or the inability to use the Service**; or (ii) the cost of procurement of substitute goods and services resulting from any goods, data, information or services purchased or obtained or messages received or transactions entered into through or from the service.

*See* 2013 Terms of Service at § 10 Exhibit H and 2014 Terms of Service at § 11 Exhibit H

(emphasis added). There is no ambiguity in this provision. "It is not within the power of a court

to make a contract for the parties, and an unambiguous agreement must be enforced in

accordance with its terms." *Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 875 (Fla.

2d DCA 2005) (quoting *Paddock v. Bay Concrete Indus., Inc.*, 154 So. 2d 313, 316 (Fla. 2d

DCA 1963)). And even if there was ambiguity, "[i]t is an axiom of contract interpretation law

that an ambiguous contract be interpreted against its drafter," and "[t]he demand to interpret

ambiguous language against the maker of an adhesion contract becomes even more imperative."

*In re Woodham*, 174 B.R. 346, 348–49 (Bankr. M.D. Fla. 1994); *see also JPay, Inc. v. Kobel*,

904 F.3d 923, 944 (11th Cir. 2018), *cert. denied*, 18-811, 2019 WL 1590250 (U.S. Apr. 15,

2019) ("Although [the drafter] says otherwise today, it agreed when drafting its Terms of Service

that an" arbitration agreement applied). Kipu drafted its Terms of Service, and gave Defendants'

no ability to edit the Terms of Service—they are plainly contracts of adhesion, and any

ambiguity must be read against Kipu and in favor of Defendants.

Thus, while Defendants maintain that neither the 2013 Terms of Service nor the 2014

Terms of Service apply, if either do, Kipu must also live by those same terms.  Under those

Terms of Service, Defendants cannot be liable for any consequential damages, including

damages for Kipu's purported lost profits arising out of Defendants' use of Kipu's service. *See*

2013 Terms of Service at § 10 and 2014 Terms of Service at § 11. Yet, Kipu's entire lawsuit

seeks solely consequential damages and lost profits allegedly arising from Defendants' use of

Kipu's EMR system. The introductory paragraph of Kipu's Amended Complaint boldly claims that as a result of Defendants' actions, "Kipu has consequently suffered damages in an amount not less than $30,000,000.00." *See* Amended Complaint at ¶ 1. Kipu's damages expert confirmed that the 30-million dollar "damages" estimate consists entirely of lost profits, reporting that "Kipu's combined lost profits for the 10-year period [from] January 1, 2015 to December 31, 2024 [are] calculated at $28,705,200." *See* Expert Report of Alan I. Blass, Exhibit Q, at p. 3. Kipu's damages expert reiterated that his entire methodology is to determine "Kipu's lost profits [that] are directly related to the lost opportunity to profit from a percentage of ZenCharts customers, which, but for the alleged actions of ZenCharts, would have otherwise been converted by Kipu." *See* April 15, 2019 Response Report of Alan I. Blass, Exhibit U, at p. 2. Kipu is exclusively seeking lost profits in this case, but lost profits were waived by the Terms of Service that Kipu unilaterally drafted. Kipu cannot now sue Defendants for consequential damages arising from their use of Kipu's EMR service, including Kipu's purported lost profits. Defendants are entitled to partial summary judgment on that issue.

## <u>CONCLUSION</u>

WHEREFORE, Defendants respectfully request that the Court enter an order (i) granting this motion, (ii) entering partial summary judgment in favor of Defendants, (iii) entering final judgment in favor of Defendants, (iv) awarding Defendants' attorneys' fees and costs, and (v) granting any other relief the Court deems proper.

Respectfully submitted, this 20th day of May, 2019.

BALCH & BINGHAM LLP

*/s/ Charles Brumby*
CHARLES BRUMBY
(FL Bar No. 0084054)
cbrumby@balch.com
1 Independent Drive, Suite 1800
Jacksonville, FL 32202
Telephone: (904) 348-6875
Facsimile: (904) 396-9001

Geremy W. Gregory
(FL Bar No. 102645)
ggregory@balch.com
1 Independent Drive, Suite 1800
Jacksonville, FL 32202
Telephone: (904) 348-6875
Facsimile: (904) 396-9001

Walter H. Boone (MSB #8651)
(Admitted *pro hac vice*)
wboone@balch.com
188 East Capitol Street, Suite 1400
P. O. Box 22587
Jackson, MS 39225-2587
Telephone: (601) 965-8179
Facsimile: (888) 956-9542

Adam K. Israel (ASB # 3883A54I)
(Admitted *pro hac vice*)
aisrael@balch.com
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8799

ATTORNEYS FOR MOVANTS

JOHN S. SARRETT, P.A.

*/s/ John S. Sarrett*
JOHN S. SARRETT
(FL Bar No. 812811)
jsarrett@sarrettlaw.com
999 Vanderbilt Beach Road, Suite 200
Naples, FL 34108
Telephone: (239) 325-3350
Facsimile: (239) 790-5063

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of May, 2019, a true and correct copy of the

above and foregoing was served via electronic correspondence on the following counsel of

record:

Christopher Spuches
cbs@agentislaw.com
AGENTIS PLLC
501 Brickell Key Drive, Suite 300
Miami, Florida 33131

Mark Evan Stein
MARK STEIN LAW, P.A.
mark@marksteinlaw.com,
hlgservice@hlglawyers.com,
michelle@marksteinlaw.com,
sdarby@hlglawyers.com
2999 N.E. 191st Street, Suite 330
Aventura, Florida 33180

*Counsel for Plaintiff, Kipu Systems, LLC*

Alexis Sophia Read, Esq.
alexis.read@dunnlawpa.com
DUNN LAW, P.A.
555 NE 15th Street
Suite 934-A
Miami, Florida 33132

*Counsel for Defendant/Counter-Plaintiff, Zen Medical LLC*

                      */s/     Charles Brumby*
                         CHARLES BRUMBY